Harry L. **WALLACE**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 8469.

District of Columbia Court of Appeals.

Argued Jan. 15, 1975.

Decided July 26, 1976.

William D. Appler, Washington, D. C., for appellant.

Michael I. Gewirtz, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Richard A. Graham and John T. Kotelly, Asst. U. S. Attys., Washington, D. C., were on the brief for appellee. Gerard F. Treanor, Jr., Asst. U. S. Atty., Washington, D. C., entered an appearance for appellee.

Before GALLAGHER, YEAGLEY and HARRIS, Associate Judges.

GALLAGHER, Associate Judge:

This is an appeal from a jury conviction of rape [1] and sodomy.[2] Appellant was sentenced to concurrent terms of two to six years, with five and one-half years suspended. At trial, he conceded that he had sexual relations with the complainant, but asserted as his defense that she had consented. The principal issue raised is whether the testimony of the complaining witness was accompanied by sufficient cor-

1. D.C.Code 1973, § 22–2801.

2. D.C.Code 1973, § 22–3502.

roboration to warrant submission of the case to the jury. Appellant also contends the government denied him the benefits of a preliminary hearing.[3]

■ The purpose of this jurisdiction's former sex offense corroboration requirement,[4] which is applicable to this case, was to protect a defendant from fabricated or mistaken charges. Therefore, the level of corroboration required varied with such factors as "the age and sex of the complainant, the existence of a previous relationship between complainant and defendant and other circumstances . . . ." *United States v. Terry,* 137 U.S.App.D.C. 267, 270, 422 F.2d 704, 707 (1970). Since the purpose of the requirement was the prevention of conviction on baseless allegations, legally sufficient corroboration of a victim's testimony was supplied by any evidence, direct or circumstantial, which was extrinsic to the testimony of the prosecutrix and which ". . . would permit the jury to conclude beyond a reasonable doubt that the victim's account of the crime was not a fabrication." *United States v. Gray,* 155 U.S.App.D.C. 275, 276, 477 F.2d 444, 445 (1973); *In re W. E. P.,* D.C.App., 318 A.2d 286 (1974); *Moore v. United States,* D.C.App., 306 A.2d 278 (1973); *Evans v. United States,* D.C.App., 299 A.2d 136 (1973).

The complaining witness in this case was approximately 22 years old at the time of the incidents here at issue. According to her testimony, she had known appellant for more than a year prior to May 4, 1973, when he telephoned her and she declined an invitation to a party.

After they had first been introduced, the complainant and appellant had gone out together three or four times, but there were always other people present on those occasions; and the May 4, 1973 telephone call was their first communication in about a year. On the next morning, appellant telephoned to ask her to go horseback riding and she again declined; but when he called later the same day and invited her to go to a club that evening, she accepted after she was told that they would be accompanied by her friend, Marlene Kaliponi, and appellant's brother, Morris Wallace. Appellant and his brother picked her up at her apartment at 8 p. m. in appellant's automobile, and then drove to appellant's apartment, where the brother departed in appellant's car, after saying that he would return later with his date.

The complainant testified that this was the first time that she and appellant had been alone and that during the next five hours they sat together on the sofa in the living room, with "some distance" between them and had "general conversation." On one occasion, they danced to slow music for a "a couple of minutes," and appellant attempted to kiss her, but she rebuffed him by saying that she "didn't come here for anything like that." In the five-hour period she drank one glass of wine, and appellant had several drinks of scotch, as well as some wine.

At approximately 2 a. m., when Marlene Kaliponi and Morris Wallace failed to appear and the complainant had twice been unable to reach Miss Kaliponi by telephone, she called another friend, Janet Davis, her former roommate (who then lived in another apartment in the complainant's building) and asked about the two, but Miss Davis had not heard from them. Shortly thereafter, appellant left the apartment for ten minutes or so and returned with a package of cigarettes. At that point, he suddenly informed her that she

---

3. We have examined appellant's remaining contention that the evidence was insufficient to support the verdicts and find it without merit.

4. Although the corroboration requirement was in effect at the time of the trial in this case it is no longer mandated in this jurisdiction in rape cases of this nature. Our recent decision in *Arnold v. United States,* D.C.App., 358 A.2d 335 (1976) (en banc), so holds.

had been "set up" and that she could "either put up a fight or give it up." She testified that she knew he was referring to sex and replied "I'm not going to give it up. If you want it, you'll have to fight for it."

She attempted to leave but appellant grabbed her by the arm and then around the neck and dragged her into the bedroom. During this time, she was crying, screaming, and hitting at appellant.

When they got into the darkened bedroom, appellant pushed her onto the bed and jumped on her. As a result of the struggle, they both rolled from the bed to the floor at which time appellant reached to a nearby dresser, grabbed a small "skinny" knife about three inches long and a quarter of an inch wide and, holding it next to her throat, told her that if she did not take her clothes off, he would rip them off. Subsequently, appellant put the knife down, both disrobed, and the acts charged took place. The prosecutrix testified that, although upset, she did not struggle further because her life had been threatened.

After the sexual acts were completed, appellant told her that he might not let her go because he feared that she would report to the police, and when she asked if he was going to kill her, he replied he "didn't know." She then said that she would not make such a report and asked that appellant telephone his brother so that she could go home.

Appellant did so, and Morris Wallace arrived a few minutes later, and, according to the complainant, immediately asked if she was hurt. She replied that she was not, but that she wanted to go home. At that time, she was upset, unstable, and quiet, and her eyes were "puffy" from crying.

Instead of going to her apartment, at Morris Wallace's suggestion, the three drove in appellant's car to Suitland, Maryland, where Marlene Kaliponi lived. Upon arrival in Suitland at about 5:15 a. m., ap-

pellant's brother went to the Kaliponi apartment, and after first telephoning the apartment from a nearby booth appellant and the complainant also went there. The three visitors stayed for about five minutes and then departed for Washington. The complainant testified that she did not mention the rape to her friend because Miss Kaliponi was "highly nervous," and might "give it away," meaning that her friend might indicate to the brothers that she had revealed what had happened.

When the trio arrived at the complainant's apartment building at about 6:00 a. m., she entered the building alone and went directly to the apartment of her friend Janet Davis. When Miss Davis opened the door, the complainant said "Harry raped me," began to cry, and recounted the events of the preceding ten hours. Shortly thereafter, Miss Davis, at the complainant's request, telephoned complainant's grandmother in Cumberland, Maryland, some neighbors, and then complainant's cousin, a Metropolitan Police Officer, who, in turn, notified the sex squad. The grandmother was called because the complainant believed that she "could take it better than [her] mother."

The principal corroborative evidence in this case was in the form of testimony by two government witnesses. The first such witness was Marlene Kaliponi, who described herself as a very close friend and co-worker of the prosecutrix, who had double-dated with her in the company of appellant and his brother Morris. It was to her apartment in Suitland that appellant, appellant's brother and the complainant went after the incident in question in the early hours of Sunday, May 6, 1973. Miss Kaliponi's testimony was, in pertinent part, that when the complainant arrived at the apartment in Suitland, she was unusually quite and that her eyes were "puffed up" as if she had been crying.

The second person who gave corroborating testimony was Janet Davis, the complainant's co-worker and former roommate

who then lived in the same building. Miss Davis testified that at approximately 2:00 a. m. she had received a telephone call from the complainant who said that she was at appellant's apartment and that "Marlene [Kaliponi] and she were supposed to be going out with him and his brother and she hadn't shown up." The witness also testified that immediately after the complainant entered her apartment at 6:00 a. m., she said that she had been raped by "Harry" and began to weep and cry "real loud." Finally, Miss Davis described how, at the complainant's request, she made telephone calls to some neighbors who came to the apartment "to see what they could do." She also phoned the complainant's grandmother in Cumberland, Maryland, and complainant's cousin, a Metropolitan Police Officer who also came to the apartment.

The stipulated medical evidence was that an examination conducted that morning at D.C. General Hospital revealed the presence of sperm in the vagina, but no external or internal bruises or other injuries.

At trial, appellant conceded the fact of sexual relations, but contradicted the particulars of the complainant's testimony as they related to force. He also stated that their relationship was closer and more prolonged than admitted by complainant and, specifically, that on one prior occasion they had engaged in consensual sexual intercourse at his apartment. Both he and his brother testified that they had not suggested to complainant that the three of them were to go out together with Miss Kaliponi that night, and the brother testified that he observed nothing out of the ordinary in complainant's appearance or behavior. Another defense witness testified, *inter alia,* that appellant and complainant had

been left alone together on one occasion in 1972.

We conclude there was independent corroborative evidence sufficient to "permit the jury to conclude beyond a reasonable doubt that the victim's account of the crime was not a fabrication," [5] *e. g.,* her behavior and appearance while still in the company of appellant in Suitland, Maryland, her emotional state (crying) when free of appellant and her prompt disclosure of the rape when out of his presence, the immediate long distance call to her grandmother, the immediate notification of the rape to her neighbors in the apartment house, and finally, the call to her cousin (a police officer) to notify him, with her visit to the hospital for examination following this.

Lastly, appellant contends he is entitled to a new trial because he was deprived of his right to a preliminary hearing when a *nolle prosequi* was entered by the government to avoid defense questioning of the complainant at the preliminary hearing after which an indictment was secured. It has been held under similar circumstances that this does not require a reversal for a new trial. *United States v. Coley,* 441 F.2d 1299 (5th Cir.), *cert. denied,* 404 U.S. 867, 92 S.Ct. 85, 30 L.Ed.2d 111 (1971); *cf. United States v. Rogers,* 455 F.2d 407 (5th Cir. 1972).[6] Additionally, appellant was later furnished the complainant's signed statement concerning the offense as well as her grand jury testimony.

We find no error requiring reversal and the judgments are

*Affirmed.*

5. *United States v. Gray, supra,* 155 U.S.App. D.C. at 276, 477 F.2d at 445.

6. *Cf.* Super.Ct.Cr.R. 5(c)(2).