Isaac L. WILLIAMS, Appellant,

v.

UNITED STATES, Appellee.

No. 10643.

District of Columbia Court of Appeals.

Argued Jan. 4, 1977.

Decided April 25, 1978.

Rehearing and Rehearing en Banc Denied June 27, 1978.

Warren C. Nighswander, Public Defender Service, Washington, D. C., for appellant.

Larry C. Willey, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, and Peter A. Chapin, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before NEBEKER, HARRIS and MACK, Associate Judges.

NEBEKER, Associate Judge:

Appellant was convicted of assault with intent to commit rape while armed (D.C. Code 1973, §§ 22–501, –3202); armed robbery (D.C.Code 1973, §§ 22–2901, –3202); and sodomy (D.C.Code 1973, § 22–3502). He appeals his convictions on two grounds: (1) the trial court did not impose the sanction of striking the victim's identification testimony under the Jencks Act, 18 U.S.C. § 3500 (1970), when the government could not produce a copy of a statement of the victim which contained an initial description of her assailant; and (2) the trial court failed to give a corroboration instruction to the jury on the assault with intent to rape and sodomy counts of the indictment. The trial court refused to impose Jencks Act sanctions because of its finding that the destruction of the notes of the initial description was not intentional or negligent, but rather occurred under circumstances which indicated that the victim was uncooperative and would decline to prosecute. The trial court refused the corroboration instruction on the understanding that such was not legally mandated. We affirm.

The victim's initial encounter with appellant, a stranger, occurred as she was walking home after a day of shopping. Appellant approached her, displayed a handgun, and instructed her to continue walking. Appellant then directed her behind a building, took her money and the packages which she was carrying, and ordered her to remove her pants and underwear. After an attempt by appellant at intercourse failed, appellant forced the victim to perform fellatio. Finally, after gathering some of the items which the victim had purchased that day, appellant moved her pants some distance away in an attempt to delay her dressing, threatened her if she followed him, and then fled the scene. The victim dressed, waited for several minutes, and went home to call the police.

Upon the arrival of Officer Coffey and her husband, the victim gave a description of her assailant. That description was noted on a PD–251 offense form prepared by Officer Coffey. Shortly thereafter, the investigation was taken over by two detectives who accompanied the victim to D.C. General Hospital for the purpose of having her undergo a medical examination. It was

not then clear whether some vaginal penetration had occurred. However, at the hospital, her husband, who had been agitated and impatient since notification of the crime, took her away before any examination could be performed. He became incensed at the manner in which the hospital staff treated his wife. The following day, the victim was interviewed by yet another officer to whom she gave a description of the assailant.

Several days later, and quite fortuitously, the victim and her husband encountered appellant in a drug store. It was the same drug store in which the victim had shopped immediately before the assault. She pointed out appellant to her husband, who then sent her home and left to arm himself with a knife. Upon his return to the drug store, appellant was gone. The victim and her husband thereafter identified appellant from police department slides and at a lineup. Appellant, whose defense was alibi, lived within five blocks of the scene of the offense.

## I.

As to the Jencks Act issue, the following is relevant. After detectives had assumed control of the investigation, Officer Coffey left the premises with a still-to-be completed PD–251 form and with the investigation still in an uncertain state. Later that same evening, one of the detectives contacted Officer Coffey and told him of the hospital episode and of the refusal of the victim and her husband to remain for her medical examination. Both officers concluded from the couple's leaving the hospital that no complaint would be filed. Therefore, the detective told Officer Coffey not to file the PD–251 but instead to file a PD–253 incident report. The officer thereupon discarded the PD–251, filed the PD–253, but failed to transfer the complainant's description of the assailant to the PD–253 form although there was space designated for such information. Officer Coffey was not directed to

destroy any notes or reports already filled out, but decided on his own to do so. He was aware of police regulations requiring preservation of recorded descriptions of suspects.

Appellant argues that the destroyed description was a statement adopted by the complainant and thus clearly within the ambit of a portion of the Jencks Act. See 18 U.S.C. § 3500(e)(1) (1970). This contention is based solely on the fact that the officer read the description back to the complainant, who then stated that it was correct. Appellant also argues that the statement was not incorporated into any other document. However, our reading of the record discloses that a transcript of Officer Coffey's broadcast description was made available to defense counsel. Considering that the broadcast followed immediately after Officer Coffey was given the description, we are inclined to view the record as reflecting that the broadcast incorporated the initial description.[1] See Reed v. United States, D.C.App., 383 A.2d 316 (1978); Moore v. United States, D.C. App., 363 A.2d 288 (1976).

Since the trial court did not make a specific finding one way or another on this point—having concluded only that the destruction of the PD–251 was neither negligent or intended to prejudice the accused—we cannot decide the issue on the basis of whether the evidence supports a finding of incorporation. We do, however, give considerable weight to this part of the record in our evaluation of the total circumstances behind the refusal to strike the victim's identification testimony.

Finally, appellant asserts that regardless of the degree of negligence, which he contends was extreme, the loss resulted in severe prejudice to the defendant by limiting his opportunity to impeach the complaining witness' identification testimony as well as her in-court repetition of the description of her assailant which she said she gave on the night of the offense.

1. While Officer Coffey did not remember broadcasting the lookout, his partner, Officer Hale, testified that Coffey did make the broadcast and that "he would have to get [the description] from the complainant." (Tr. I, at 102.)

As in related areas of identification testimony, we think the "totality of circumstances" approach to the issue of admissibility is the only rational course to take in assessing appellant's arguments. Our reading of previous cases dealing with the Jencks Act in this jurisdiction reveals that that is what has been done—weighing the relative good faith and judgment of the officer, the degree of prejudice inherent in the absence of a bona fide "statement," and the impact of the imposition of any meaningful sanctions in the quest for truth. *See, e. g., Fields v. United States,* D.C.App., 368 A.2d 537 (1977); *March v. United States,* D.C.App., 362 A.2d 691 (1976); *Hardy v. United States,* D.C.App., 316 A.2d 867 (1974); *Banks v. United States,* D.C.App., 305 A.2d 256 (1973). The Supreme Court recently applied this "totality of circumstances" approach in the context of suggestive procedures used in obtaining identification evidence. *See Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). In that case, the Court cautioned against "inflexible rules of exclusion, that may frustrate rather than promote justice, . . ." 97 S.Ct. 2252. The Court further commended consideration of the "totality of circumstances" as "serv[ing] to limit the societal costs imposed by a sanction that excludes relevant evidence from consideration and evaluation by the trier of fact." 97 S.Ct. 2251. *See also Lee v. United States,* D.C.App., 385 A.2d 159 (1978) (similar considerations weighed in "fashioning sanctions for failure to make proper disclosure under [Super.Ct.Cr.] Rule 16"). 385 A.2d at 163.

Like concerns were voiced by the United States Court of Appeals for the District of Columbia Circuit in *United States v. Perry,* 153 U.S.App.D.C. 89, 99, 471 F.2d 1057, 1067 (1972), where the court stated:

[U]nless either in the instant or subsequent cases the interest of justice will be furthered by penalizing the Government, then [the penalty of striking the testimony of a witness] is not to be invoked automatically as in an adversary game. In order to exclude testimony, there should be a showing of either negligence or purposeful destruction accompanied by either bad motive or bad judgment. . . .

The court further concluded that even if the trial court does find some degree of negligence, it need not invoke automatically the sanctions of the Jencks Act. *Id.* at 100, 471 F.2d at 1068.

Applying these considerations to the instant case, we note that the only meaningful sanction, and the one requested, would have been the total exclusion of the only identification evidence which was available. The totality of the circumstances in the instant case militates overwhelmingly against the imposition of such an extreme sanction. It is apparent that the officer's nontransposition and discarding of the notes is regrettable. However, in view of the events immediately following the crime which reasonably revealed that no complaint would be filed, and assuming arguendo that the notes reached the level of constituting a "statement" (although the trial court never so found), it is also apparent that the disposal of the PD–251 by the officer was not accompanied by bad motive or bad judgment of a degree which could warrant refusal to allow the victim to give testimony identifying her assailant. *See Fields v. United States, supra.* Nor was any possible prejudice created by the loss sufficient to offset the interests served by permitting the victim to testify as to identity.

Appellant's counsel was provided with a copy of a description given detectives who replaced Officer Coffey at the scene. Appellant's counsel also had access to the radio run description based on the initial description given to Officer Coffey. *See* note 1, *supra.* We also note that appellant's counsel declined to make use of the radio run transcript for impeachment purposes. Complainant supplied a third description to yet another officer the morning after the offense. Complainant's descriptions of her assailant on all of these occasions were readily available for use by appellant, and, in fact, any inconsistencies among them were thoroughly explored at trial. More-

over, the descriptions of appellant were based on protracted contact lasting more than twenty minutes. The victim immediately recognized appellant later at the drug store and her photographic and lineup identifications further substantiated her ability to identify the perpetrator. To impose Jencks sanctions when the possibility of inconsistency between the lost notes (which, again, may or may not have constituted a "statement") and the contemporaneous broadcast tape is virtually nonexistent, would be the type of "automatic reaction to the unavailability of a statement" as "would restrict rather than enhance the quest for truth."[2] *Washington v. United States,* D.C.App., 343 A.2d 560, 563 (1975). Accordingly, we conclude from the totality of the circumstances that the refusal to strike the victim's identification testimony, and thus surely make prosecution impossible, was not error.

## II.

Appellant's attack upon the convictions for sodomy and assault with intent to commit rape centers on the refusal to give a charge that corroboration of the victim's testimony must be found as a condition for a guilty verdict on those counts.[3] Conceding the omission to be error, the government asserts that sufficient corroboration is reflected in the record and therefore "the jury's ultimate verdict would not have been influenced if a corroboration instruction had been given." Brief for Appellee at 29. Reliance is placed, properly we think, on the harmless error holding of *Arnold v. United States,* D.C.App., 358 A.2d 335, 341–42 (1976) (en banc).

In assessing the degree of prejudice to appellant created by the omission of the corroboration instruction, it is helpful to look at the purpose served by requiring corroboration. This purpose was summarized in *Wallace v. United States,* D.C.App., 362 A.2d 120, 121 (1976), where it was said:

The purpose of this jurisdiction's former sex offense corroboration requirement, which is applicable to this case, was to protect a defendant from fabricated or mistaken charges. Therefore, the level of corroboration required varied with such factors as "the age and sex of the complainant, the existence of a previous relationship between complainant and defendant and other circumstances . . ." *United States v. Terry,* 137 U.S.App.D.C. 267, 270, 422 F.2d 704, 707 (1970). Since the purpose of the requirement was the prevention of conviction on baseless allegations, legally sufficient corroboration of a victim's testimony was supplied by any evidence, direct or circumstantial, which was extrinsic to the testimony of the prosecutrix and which ". . . would permit the jury to conclude beyond a reasonable doubt that the victim's

2. In an opinion concurring in the judgment in *Goldberg v. United States,* 425 U.S. 94, 125–26, 96 S.Ct. 1338, 1355, 47 L.Ed.2d 603 (1976), Mr. Justice Powell states in part:

[T]he trial judge must be faithful to the substantive standards of producibility embodied in the Act. I agree with Mr. Justice Stevens that when subsection (e)(1) is relied upon a prosecutor's notes are producible only upon a "finding of unambiguous and specific approval" of specific notes. *Ante,* at 116, 96 S.Ct. at 1350. In my view, such a finding depends upon the witness' having approved specific notes with the knowledge that he is formalizing a statement upon which he may be cross-examined. Nothing less is sufficiently "unambiguous" in this context. * *

In applying the Act to typical interview notes alleged to have been "adopted or approved" by a witness, we must remember that such notes do not fit within the core of the Act. Subsection (e)(1) includes "*written statement* [s] *made by* [the] witness and signed and approved by him." * * * Typical interview notes are selective—even episodic—and therefore fall outside of subsection (e)(2). Even if "adopted or approved" by the witness, such notes were not written by the witness himself and therefore fall without the core of subsection (e)(1). * * [Footnotes omitted; emphasis in original.]

3. Since this case was tried before our decision in *Arnold v. United States,* D.C.App., 358 A.2d 335 (1976) (en banc), we need not address the issue whether *Arnold,* which abrogated the need for corroboration in rape cases were the victim was a mature woman, affected the rule of corroboration as to sodomy. The government concedes that it was error to have failed to give the requested instruction, but asserts that the error was harmless as to both counts.

account of the crime was not a fabrication." *United States v. Gray,* 155 U.S. App.D.C. 275, 276, 477 F.2d 444, 445 (1973), . . . [Footnote omitted.]

*See also Evans v. United States,* D.C.App., 299 A.2d 136, 139 (1973).

█ The circumstances in this case provided adequate independent evidence that the accusation was not a fabrication. There had been no previous relationship between the victim and the appellant and thus no occasion to accuse him because of friction between them. Moreover, the situs of the offense is hardly consistent with ulterior motive. The victim reported the offenses to a neighbor, to the police, and to her husband almost immediately after their occurrence. *See In re W. E. P.,* D.C.App., 318 A.2d 286, 289 (1974). In addition, the record is replete with references to the understandably extreme emotional reaction of the victim's husband to what had been done to his wife. This is significant because, despite her realization of her husband's anger, she, in a frightened state, pointed out appellant as her attacker when she encountered him for the second time. Such spontaneous reaction to the chance meeting is not consistent with a fabrication. Nor would the victim likely rekindle her husband's anger against an innocent stranger if her initial account of the sexual offense had been collusive or fabricated. In sum, the circumstances were not such as to indicate a motive for the victim to have fabricated her account of events.

Finally, to suggest, as does appellant, that the victim fabricated the accusation to increase the potential penalty for her assailant in what was undoubtedly a traumatic Christmas Eve assault is to ignore the extreme emotional difficulty of acknowledging and relating the embarrassing and revolting aspects of the sexual attack.

We must conclude that the omission of the instruction was not reversible error. D.C.Code 1973, § 11–721(c). *See Arnold v. United States, supra* at 342, *quoting* from *People v. Rincon-Pineda,* 14 Cal.3d 864, 123 Cal.Rptr. 119, 538 P.2d 247 (1975), which court sustained a conviction for rape, holding that the trial court's refusal to give a required instruction on cautious examination of the victim's testimony was harmless error.

Accordingly, the judgment of conviction is

*Affirmed.*

MACK, Associate Judge, dissenting:

In what has become a traditional ritual this court today adds more confusion to the law interpreting the Jencks Act. 18 U.S.C. § 3500 (1970). Again we face factual circumstances where the identification of an assailant was a crucial issue and where police investigative notes recording the victim's initial description of the assailant were not produced. Again this court, in seeking to uphold the trial court's denial of a motion to apply the sanctions of the Act, adds new dimensions to the statute. This time we assess the reasonableness of the trial court's action by a "totality of circumstances" approach [1] borrowed from a recent Supreme Court analysis as to whether due process compels the exclusion at trial of pretrial identification evidence obtained by unnecessary and suggestive police procedure. *See Manson v. Brathwaite,* 97 S.Ct. 2243 (1977). *See also Fields v. United States,* D.C.App., 368 A.2d 537 (1977), where we applied the "independent source doctrine" to justify a trial court's refusal, under the Jencks Act, to strike identification testimony.[2]

I do not argue for "automatic" application of Jencks Act sanctions. In my view of the law, however, whenever a statement

---

1. I note that the Supreme Court has avoided extending the "totality of circumstances" standard across the board in evaluating exclusionary rules. *See Moore v. Illinois,* 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977) (Mr. Justice Rehnquist, concurring).

2. Obviously, I do not suggest that interpretations of the constitutional exclusionary rules and their modifications weighing the risks of misidentification are less important than the Jencks statute. I only suggest there *is* a statute with a legislative mandate.

found to be producible under the statute has been destroyed by the police under certain circumstances (*see* fn. 5 *infra*), and results in the loss of crucial evidence, the application of a sanction is mandated.

Until today, it has never been questioned in this case that the written statement in issue was other than one producible under the terms of subsection (e)(1) of the Act as one "adopted and approved" by the witness-victim. The finding that it indeed was producible is implicit in the trial court's ruling, is supported by the evidence, and the government does not contend otherwise.[3]

As to circumstances of the statement's destruction, although the finding of the trial court is not clear, I think the language used[4] comes closest to saying that the statement was not destroyed in bad faith or

negligence, but purposefully (after the police decided to file a "contact report" in lieu of an "offense report") though with bad judgment. This finding therefore was not a reason *per se* for refusing to impose a sanction.[5] There is every reason for deterring the immediate destruction of the description of an alleged rapist before an arrest is made—even under circumstances where it is doubtful that a complaint will be made.[6] The importance of preservation is evident here where, when prosecution was ultimately brought, the testimony of the victim herself, the sole eyewitness, revealed inconsistent descriptions of her attacker. In our consideration of "lost" notes we have warned that " '[t]he initial description of an assailant by the victim or other eyewitness is crucial evidence, and the notes taken of that description should be kept and produced.' " *Moore v. United States,* D.C.App.,

---

3. The trial court observed that "there is no question in my mind but that Mr. Williams has a right to whatever notes were taken on December 24 by whoever took the notes." The observation was made subsequent to the time the court had heard the victim testify that, after an officer wrote down the description she had given, that:

    A. Well, they went over it and I told them it was correct, you know. They had stated what I was saying and I told them it was correct.

    Q. [By the prosecutor] He had written some material down; is that correct?

    A. Yes.

    Q. And that he read it back to you and asked you if it was correct; is that also correct?

    A. Right.

    Q. And when he read it back to you and asked you if it was correct; is that also correct?

    A. Right.

    Q. And when he read back the same material to you did you indicate that which you told him that he had written down was accurate.

    A. That's right. I did.

    Thereafter the court concerned itself with the circumstances of the destruction of the notes.

    The government does not question the producibility of the notes—indeed concedes that the officer made a mistake in not retaining the description—and the appellant suggests that the notes, in addition to being "adopted and approved" by the witness-victim could also be argued to be "a substantially verbatim recital of an oral statement made by said witness . . . and recorded contemporaneously with the

making of said oral statement." 18 U.S.C. § 3500(e)(2) (1970).

4. The court spoke of the Form 251 being destroyed in ignorance rather than negligence. While she said that she had no reason to believe it was "intentionally" destroyed, she explained that it was done so on the belief (even though the Form 253 could have carried almost the identical information) that there was no case and no reason to retain this form, noting that "we can think of what would have been the better course rather than what was the course."

5. The trial court, before imposing a sanction, need only find that the government's conduct amounted to one of the following (1) negligence and bad motive, (2) negligence and bad judgment, (3) purposeful destruction and bad motive, or (4) purposeful destruction and bad judgment. *See Hardy v. United States,* D.C. App., 316 A.2d 867, 870 (1974) quoting *United States v. Perry,* 153 U.S.App.D.C. 89, 99, 471 F.2d 1057, 1067 (1972). *Fields v. United States, supra* at 541, 547.

6. In destroying the "offense report," the officer did not transfer the description of the alleged offender to the space provided for the same on the "contact report." To this extent he was not following normal practice. *See United States v. Carrasco,* 537 F.2d 372 (9th Cir. 1976), where convictions were reversed because the trial court refused to strike the testimony of a key government witness whose written statement had been destroyed in good faith following routine procedure.

353 A.2d 16, 19, *aff'd after remand,* D.C. App., 363 A.2d 288 (1976) *quoting United States v. Bundy,* 153 U.S.App.D.C. 191, 192, 472 F.2d 1266, 1267 (1972) (Leventhal, J., concurring).

It is true that the trial court specifically found that the police, because of the barriers thrown in the way of their investigation by uncooperative complainants, had in good faith destroyed information which they thought they would not need. The finding implies that the government was neither malicious, negligent nor stupid—suggesting that the court may have assumed that this was the end of the matter and that it need not go through the "balancing" process of weighing culpability of government conduct against other factors. *See United States v. Perry,* 153 U.S.App.D.C. 89, 471 F.2d 1057 (1972).

I think that the court was required at the very least to weigh other factors under these circumstances where there was admittedly bad judgment in the destruction of the notes. However, I do not read the balancing approach adopted in this jurisdiction as does the majority. As I see it, the conduct of the government is to be weighed *by the trial court* against the importance of the evidence lost and the evidence of guilt adduced at trial. *Jones v. United States,* D.C.App., 343 A.2d 346 (1975); *Hardy v. United States,* D.C.App., 316 A.2d 867 (1974); *Perry, supra.* And quite apart from the fact that the trial court made no findings as to these factors, I have the greatest difficulty in following the claimed analogous "weighing" of the "totality of circumstances" by the majority. Thus the majority argues that the application of the only meaningful sanction (*i. e.,* the striking of the victim's testimony) would result in "the total exclusion of the only identification evidence which was available." To me this only emphasized the fact that the notes reciting the victim's *initial* description of the offender might have been crucial for impeachment purposes. And the fact that such exclusion would "surely make prosecution impossible" (of an accused who says he was not on the scene) is hardly a relevant circumstance to be balanced.

I would remand for further findings by the trial court on the issues of the importance of the evidence lost and the risk of prejudice to the defense—keeping in mind that the victim herself testified as to the initial description she gave to the police and that this description might have been incorporated into a broadcast made available to the defense in a transcription. *See Perry, supra.*