David P. CALAWAY, Jr., a/k/a James R. Scott, a/k/a David Jones, Appellant,

v.

UNITED STATES, Appellee.

No. 11713.

District of Columbia Court of Appeals.

Argued Nov. 7, 1978.

Decided Nov. 15, 1979.

**1222**

Charles W. Halleck, Washington, D. C., appointed by the court, for appellant.

Gordon C. Rhea, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Washington, D. C., at the time the brief was filed, John A. Terry and Michael W. Farrell, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee. James F. Hibey, Asst. U. S. Atty., Washington, D. C., also entered an appearance.

Before NEWMAN, Chief Judge, and KERN and GALLAGHER, Associate Judges.

GALLAGHER, Associate Judge:

In a five-count indictment appellant was charged with two counts of felony murder (D.C.Code 1973, § 22–2401),[1] one count of second-degree murder (D.C.Code 1973, § 22–2403), one count of assault with intent to commit rape (D.C.Code 1973, § 22–501), and one count of first-degree burglary (D.C. Code 1973, § 22–1801(a)).[2] Appellant was acquitted by jury of all counts except burglary. In urging reversal of his burglary conviction appellant argues that: (1) statements taken in violation of his *Miranda*[3] rights were admitted at trial; (2) the trial court erred in admitting evidence of a prior assault and robbery; (3) the trial court failed to admonish the jury sufficiently during trial and deliberations concerning trial

---

1. The first felony murder count charged appellant with a killing in perpetration of an assault with intent to commit rape. The second count charged a killing in perpetration of a burglary.

2. The burglary count charged an entry into a dwelling while a person was inside the dwelling with intent to commit a sexual assault.

3. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

publicity, and made inadequate inquiry during deliberations of two jurors who admitted having been exposed to publicity about the case; (4) certain of the trial court's communications with the jury violated his right to be present under Super.Ct.Cr.R. 43 and coerced a verdict; and (5) the evidence was insufficient to convict him of burglary and, in any event, the verdicts are fatally inconsistent. We affirm.

## I.

Adele Nicole Solomon was murdered in her apartment on Hopkins Street, Northwest, some time between 3:30 and 4 p. m. on March 23, 1976.[4] She had been strangled and struck severely on her jaw and head. Her jaw was fractured. The killer had used his hands and a nylon windbreaker to strangle her. The fact that she was found sprawled on the floor with her blouse pulled open and her pants and underpants pulled down to her ankles indicated a sexually motivated attack, although no signs of sexual abuse were found.

Appellant had been to Ms. Solomon's apartment several times that day beginning around 10:30 a. m. His ruse in calling upon her was that he was looking for a room.[5] When appellant stopped at Ms. Solomon's apartment at 10:30, he knocked on her door and talked briefly with a young woman. When he returned from her door he had a piece of paper in his hand and told a friend who was with him, one Clarence Cary, that the woman had given him the name of someone to call about renting a room. Appellant and Clarence Cary stayed in the area together until 3:00 or 3:30 p. m.

After parting company with Cary, appellant made at least two more visits to Ms. Solomon's apartment. On the first of these visits appellant, still inquiring about a room, left a piece of paper with a name, address and phone number on it so Ms. Solomon could contact him if a room became available. All the information on the note was false. The second visit occurred about ten minutes later. By this time Ms. Solomon was becoming irritated with appellant's inquiries and stated to her mother on the phone that "I don't believe he's looking for an apartment. I think he's looking for a date. He has been by before . . . . He's not my type."

Shortly thereafter Ms. Solomon was murdered. While there were no witnesses to the murder, a head hair matching appellant's was found on Ms. Solomon's bare shoulder and a pubic hair that had no traits inconsistent with appellant's was found on the rug next to the body.

After the murder, and for the first time since starting work, appellant arrived late for work that day, showing up at 4:25 p. m. instead of 4 p. m. He appeared nervous and had fresh scratches on his neck. There was testimony that whenever the murder was mentioned he would ball his fists up as if it bothered him. He also began avoiding the side of P Street near the block where the murder had taken place.

When questioned by police investigators nineteen days later about his activities on the day of the murder, appellant lied about having filled out a room application under the alias David P. Jones, having inquired door-to-door about places to live, having ever been on or even having knowledge of the street where Ms. Solomon lived, and having arrived late for work. He also lied about his activities with Clarence Cary on the afternoon of the murder.[6]

## II.

Appellant filed a timely motion to suppress the statements he made to police in-

4. The time of the killing was established by the fact that Ms. Solomon was on the phone with her mother that day until about 3:30 p. m., did not answer her phone when a friend called between 3:45 and 4 p. m., and missed a 5:30 doctor's appointment. Medical testimony placed the time of death between 2:45 and 6:45 p. m. We view the evidence, as we must, in the light most favorable to the government.

5. Earlier that morning appellant had filled out an application at a nearby apartment house called Hartnett Hall. He used the false name David P. Jones in that application.

6. Also introduced into evidence was testimony concerning a prior, similar attack committed by appellant in 1969. This testimony is summarized in Part III, *infra*.

vestigators. This motion was denied after a hearing and the statements were introduced at trial. Appellant now urges that denial of his motion to suppress was reversible error.

Appellant was visited by police detectives Crist and Drummond on April 11, 1976 at the Embassy Gulf Station on P Street where he worked. At this time he was a suspect in the case. After identifying themselves, the detectives informed appellant that he was not under arrest but that they wanted to question him at their office about something that happened in the area on March 23. They offered him a ride down and back. Appellant then said he would go with them if his boss agreed, and, apparently having obtained his boss' permission, appellant went with the officers to the police station where he was interviewed for about 15 to 20 minutes in a small interview room. During this period of questioning appellant gave answers which the officers knew were false, and they arrested him for the murder of Ms. Solomon. Appellant was immediately handed a card with his *Miranda* rights printed on it which he read out loud and stated he understood. He then indicated his desire to have an attorney present before answering further questions. Detectives Crist and Drummond immediately ceased questioning appellant and began assembling their papers to leave.

As they were doing so appellant suddenly asked them, "What date was that?" Crist answered that it was March 23, and appellant then stated he could prove where he was that day. At that point the officers warned appellant that no attorney was present and again informed him of his rights. Nevertheless, appellant proceeded to relate his version of his comings and goings of March 23. He continued in this vein for seven or eight minutes, even after a fourth warning from the officers. Drummond and Crist wrote down appellant's statement and asked questions to clarify names, addresses, and times in appellant's story.

Appellant argues that he was in custody from the moment Detectives Drummond and Crist contacted him at Embassy Gulf, so that their failure to there give him his *Miranda* warnings requires suppression of all statements made thereafter. Secondly, he argues that statements made after his arrest were elicited unlawfully because he had requested an attorney and the officers continued to question him without one present.

■■■■ Custody is the linchpin of the *Miranda* requirements. As the Supreme Court has held, not every questioning by police of citizens is *custodial* interrogation. Custody for *Miranda* purposes occurs when the suspect's freedom to depart is restricted in some significant way. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A mere "focussing" of an investigation upon a suspect does not entail the kind of coercion that triggers the *Miranda* requirements. *Beckwith v. United States,* 425 U.S. 341, 347, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *United States v. Calhoun,* D.C.App., 363 A.2d 277, 283 (1976). Likewise, the mere questioning of a person at the stationhouse is not automatically deemed custodial. *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). What is determinative of custody is that the police, by word or conduct, have manifested to the suspect that he is not free to leave. *United States v. Hall,* 421 F.2d 540, 545 (2d Cir. 1969), *cert. denied,* 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970). *Compare Oregon v. Mathiason, supra* (stationhouse interrogation not custodial) *with Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) (questioning at suspect's home custodial). The coincidence of the pre-custodial focussing of the investigation and the precinct questioning, without more, is not custody. *Oregon v. Mathiason, supra.*

■■■■ Appellant argues that here, unlike *Mathiason,* the officers had probable cause to arrest him. In so doing, he seems to be employing the term "probable cause" rather loosely.[7] Assuming the existence of proba-

---

**7.** Prior to appellant's questioning, the officers knew only that appellant had, at some unknown time, given a note to Ms. Solomon with a false name, address, and phone number on it,

ble cause, it is a circumstance to be considered to the extent that it makes it more likely that investigators will "bear down in interrogation and [ ] create the kind of atmosphere of significant restraint that triggers *Miranda* . . .." *United States v. Hall, supra* at 545, but it is not controlling on the question. The trial court found, with record support, that no such coercive atmosphere existed. Appellant also argues that the way he was transported to the stationhouse distinguishes this case from *Mathiason*. While use of a police car to transport a suspect to the stationhouse might in other circumstances add to the coercive aspects of the questioning, it did not do so here. The detectives gave appellant a choice whether to come with them in their car, and waited until he had obtained permission from his boss before leaving. Significantly, they told him he was not under arrest and offered him a ride back after the questioning was over. On these facts the trial court's finding of no custody until the arrest occurred was not clearly erroneous.[8]

■ Turning to appellant's second argument, it is fundamental *Miranda* law that statements offered while in custody without prompting by police are admissible. Furthermore, *Miranda* is no bar to a waiver of a previously invoked right to remain silent. *Michigan v. Mosley,* 423 U.S. 96, 103–06, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); *Peoples v. United States,* D.C.App., 395 A.2d 41, 43–44 (1978); *Taylor v. United States,* D.C.App., 380 A.2d 989, 993–94 (1977); *United States v. Cavallino,* 498 F.2d 1200, 1202 (5th Cir. 1974). The question here revolves around the voluntariness of the waiver, and we will not overturn a trial court's finding of voluntariness unless it was without substantial support in the evidence. *Peoples v. United States, supra* at 44–45. This finding in turn depends on whether the officers "scrupu-

lously honored" the arrestee's right to terminate questioning. *Michigan v. Mosley, supra,* 423 U.S. at 104, 96 S.Ct. 321; *Peoples v. United States, supra* at 44.

■ Appellant's first remark after invoking his right to remain silent was spontaneous and unprompted by police. It is therefore admissible. Detective Crist's subsequent statement, in responding to appellant's question, that the murder had occurred on March 23 did not amount to interrogation because it was merely a straightforward response to appellant's unexpected question. *Compare Brewer v. Williams,* 430 U.S. 387, 399–401, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (psychologically coercive statements of officer in police car deemed "interrogation"). Thereafter no questions were asked until appellant continued to talk in the face of repeated warnings. In view of this, and the fact that questioning was previously cut off immediately upon appellant's request, it is evident that the officers did not violate appellant's rights and that they did not question him again until he had waived his rights. *See Michigan v. Mosley, supra; Peoples v. United States, supra.* The trial court's finding of voluntariness had substantial support in the record.

### III.

As another ground for reversal appellant urges that the trial court erred in admitting over his objection testimony concerning a prior assault and robbery committed by him. Appellant did not take the stand. The testimony was admitted under *Drew v. United States,* 118 U.S.App.D.C. 11, 331 F.2d 85 (1964), as substantive evidence.

The gist of the testimony of the prior offense was that a woman was working as a night clerk at a hotel in Wheeling, West Virginia, in July 1969, when appellant approached her and asked for a room for the

---

8. and that early on the day of the murder he had filled out a room application at Hartnett Hall under the name David P. Jones. Until appellant's interview there was a reasonable possibility that these facts could be explained innocently.

8. The facts here distinguish this case from the Supreme Court's recent decision in *Dunaway v. New York,* —— U.S. ——, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

night. She took him up to the second floor to show him the one available room. She went inside to turn on the light. When she turned around, she saw that appellant had shut the door behind him and locked it. Appellant then told her to take her clothes off. When she tried to escape out the door, appellant pulled her back by her arms and hit her so hard on the jaw with his fist that she was knocked on to the bed. Appellant got on top of her and pinned her down. He started to strangle her with his hands. After scratching appellant and getting loose, she told appellant she would take him downstairs and give him all the money that was down there. Appellant agreed, followed her downstairs, and took the money. Subsequently he was arrested and tried.

After this testimony, the trial judge instructed the jury to consider it only as it tended to prove (1) appellant's *intent* when he committed the acts charged in the Solomon case; (2) his *motive* for committing the acts charged in the Solomon case; and (3) his *predisposition to gratify his sexual desires* with Ms. Solomon.

■■■ Evidence of prior crimes is inadmissible to prove bad character or predisposition to commit the crime charged. *Drew v. United States, supra* 118 U.S.App.D.C. at 15, 331 F.2d at 89. Subject to the trial judge's weighing of probative value against the likely prejudicial impact of the evidence, such evidence may be admissible to prove other issues in the case. Five such issues for which this kind of evidence may

be admitted are: (1) motive, (2) intent, (3) absence of mistake or accident, (4) common scheme or plan, or (5) identity. *Drew v. United States, supra* 118 U.S.App.D.C. at 16, 331 F.2d at 90.

■■■ Here there are significant similarities in modus operandi which are probative of appellant's identity as the attacker of Ms. Solomon. Both attackers used the ruse of seeking a place to stay as part of a scheme to commit rape.[9] The victims were both young, white women. The attacker in both instances either ordered the victim to remove her clothes or began forcibly removing them himself. A severe blow to the jaw was then given to subdue both victims, followed by the attacker's climbing on top of the victim and manually strangling her. These similarities are as strong as those in other cases in which we have approved admission of the evidence to prove identity. *See Bridges v. United States,* D.C.App., 381 A.2d 1073, 1078 (1977), *cert. denied,* 439 U.S. 842, 99 S.Ct. 135, 58 L.Ed.2d 141 (1978); *Arnold v. United States,* D.C.App., 358 A.2d 335, 338–39 (1976);[10] McCormick on Evidence § 190, at 449 (1972).

For these same reasons, the testimony was probative of appellant's motive and intent in attacking Ms. Solomon. The jury could have concluded, based on the similarities with appellant's prior attack, that he had a similar purpose here. Specific intent was an element which the government had the burden of proving. It is recognized that evidence of prior conduct is relevant

---

9. We reject appellant's contention that his conduct toward the prior victim in West Virginia was not "related to any sexual matters." (Appellant's Brief at 29.) Once alone with her, appellant locked the hotel room door, ordered her to take her clothes off, and climbed on top of her on the bed. The jury could have reasonably concluded that appellant's original intent was to rape her and that this intent was diverted only by her resistance and offer of money. *See* McCormick on Evidence § 190, at 452 (1972).

10. In *Arnold* evidence of two separate rapes was held admissible:
 [W]hile the two rapes here involved occurred at different times, the methods employed by the rapist in each case were strikingly similar. For example, in each case the rapist,

driving a light blue Volkswagen, invited the victim into the automobile as an act of friendly concern and for an apparently innocent purpose. In each case the friendly attitude of the rapist changed suddenly, and without provocation, to one of anger accompanied by threats of bodily harm and death, because of *some injury allegedly perpetrated on him* or some one of his relatives by the victim or some one of her relatives. In each case the rape was accomplished by first putting the victim in fear of her life and then apparently abandoning that purpose and demanding and obtaining submission to sexual intercourse. Finally, after each rape the victim was treated kindly and returned to her destination. [358 A.2d at 338–39.]

when specific intent is in issue. *See* 1 Wharton, Criminal Evidence § 245 (13th ed. 1972).

Appellant argues that the eight-year gap between the two incidents, plus the fact that one took place in Wheeling, West Virginia, and the other in Washington, D.C., so reduces the probity of the evidence that it should have been excluded. *See Tinsley v. United States,* D.C.App., 368 A.2d 531, 536 (1976). Appellant's argument ignores the fact that appellant was shown to be *present* in both Wheeling and Washington at the times and scenes of the crimes. Furthermore, appellant was incarcerated for seven of the eight years between the incidents. The trial judge did not abuse his discretion in admitting the evidence to prove intent and motive.[11] *See United States v. Bobbitt,* 146 U.S.App.D.C. 224, 450 F.2d 685 (1971) (not abuse of discretion to admit evidence of threat that occurred twelve years before killing when proof also showed that "bad blood" between defendant and victim had continued during that time).[12]

### IV.

Appellant urges for the first time on appeal that the trial court committed reversible error in its handling of trial publicity.[13] Contrary to our usual practice, we will explore it due to the nature of the complaint.

He argues: first, that it failed to admonish the jury sufficiently concerning trial publicity; and second, that it ignored the recommendation made in *Coppedge v. United States,* 106 U.S.App.D.C. 275, 272 F.2d 504 (1959), *cert. denied,* 368 U.S. 855, 82 S.Ct. 92, 7 L.Ed.2d 52 (1961), to inquisite jurors who have been exposed to trial publicity individually and outside the presence of the other jurors concerning the effect of that publicity upon them.

The jury in this case was not sequestered. Aware of the possibility of trial publicity, the court continually gave the jury publicity warnings in the four and one-half days of trial before it failed to warn them on the first full day of deliberations.[14] At the end of that day the jury acquitted appellant on the three homicide charges. That night and the next morning there was some publicity about the verdicts in the papers and on radio or television. That morning two jurors admitted having been exposed to some of this publicity.[15] The court interrogated them individually in the presence of the other jurors. Both jurors indicated that they would not be prejudiced by their exposure to the publicity. They were then sent back to continue deliberations and at the end of the day returned a verdict of guilty on the burglary charge.

11. The testimony was admissible to prove appellant's identity.

12. The trial court erred, however in stating he was admitting the evidence to prove also a predisposition to gratify sexual desires with Ms. Solomon. Since the testimony related to sexual conduct with a person *other* than Ms. Solomon it would have been admissible only if it had shown an unusual sexual taste or preference on appellant's part. *See Dyson v. United States,* D.C.Mun.App., 97 A.2d 135, 137–38 (1953) (sodomy); *Bracey v. United States,* 79 U.S.App.D.C. 23, 26, 142 F.2d 85, 88, *cert. denied,* 322 U.S. 762, 64 S.Ct. 1274, 88 L.Ed. 1589 (1944) (preference for little girls); *State v. Edwards,* 224 N.C. 527, 31 S.E.2d 516 (1944) (incest); *State v. Jackson,* 82 Ohio App. 318, 81 N.E.2d 546 (1948) (incest); McCormick on Evidence, *supra,* § 190 at 499–50. It did not and therefore its admission under the "sexual predisposition" exception would have served only to prove that appellant was likely to commit rape. *See United States v. Huff,* 143 U.S.App. D.C. 163, 166–67, 442 F.2d 885, 888–89 (1971).

"[T]his is precisely what the prosecutor is not allowed to show in a criminal case." *Lovely v. United States,* 169 F.2d 386, 388 (4th Cir. 1948). However, since the evidence was admissible under the intent, motive and identity exceptions, its admission under the "sexual predisposition" exception was harmless error.

13. Ordinarily we would be reluctant to entertain an issue of this nature raised for the first time on appeal, but since the question of prejudicial trial publicity is one "seriously affect[ing] the fairness, integrity or public reputation of judicial proceedings," *Johnson v. United States,* 318 U.S. 189, 200, 63 S.Ct. 549, 555, 87 L.Ed. 704 (1943), we will address the question here.

14. In context, we view this single omission as without any substantial significance.

15. The jury was sent back to continue deliberations on the assault and burglary charges on November 23.

■ Appellant's first contention is lacking in merit. The trial court's record of admonitions from the bench satisfies the rule that trial courts should "invariably admonish" jurors to avoid trial publicity in nonsequestered jury cases. The court's omission on one occasion during the trial did not affect the fairness of the trial. *Compare Coppedge, supra; Carter v. United States,* 102 U.S.App.D.C. 227, 252 F.2d 608 (1957); *Brown v. United States,* 69 App. D.C. 96, 99 F.2d 131, *cert. denied,* 305 U.S. 562, 59 S.Ct. 97, 83 L.Ed. 354 (1938) (no warnings given during trial).

■ Appellant's second contention that the trial court ignored the recommendation of *Coppedge, supra,* is also lacking in merit. In addition to admonishing jurors to avoid publicity about the case, trial courts should also interrogate jurors to determine if any have been exposed to prejudicial publicity when such publicity is called to its attention by counsel. If any jurors have been exposed to the publicity, the court should then make "a careful, individual examination of each of the jurors involved, out of the presence of the remaining jurors, as to the possible effect of the articles." *Coppedge, supra,* 106 U.S.App.D.C. at 279, 272 F.2d at 508.

The need for such private, individual inquiry, however, is not automatic. It arises only "[w]hen the publishing of specific examples of inadmissible evidence is brought to the court's attention." *United States v. Thomas,* 463 F.2d 1061, 1063 (7th Cir. 1972). This procedure permits the trial court to determine in the first instance whether there is a sufficient likelihood of prejudice from the publicity to warrant interrupting the trial and calling the jurors' attention to the fact that there has been damaging publicity about the case. If the judge determines that the publicity is not prejudicial, or that it appeared under circumstances making it unlikely that jurors have been exposed to it, then the *Coppedge* procedure serves no useful purpose. *See United States v. Perrotta,* 553 F.2d 247, 249 (1st Cir. 1977); American Bar Association Project on Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press § 3.5(f) (1968).

■ At no point did defense counsel present specific newspaper articles or news transcripts to the court, or allege that the publicity was prejudicial.[16] Neither did he move for a mistrial, request private interrogation of the two jurors, or object to the court's procedure. In this context, the court's decision to interrogate the two jurors individually in the presence of the remaining jurors rather than privately was not error, much less plain error.

■ Since the question was not raised below, appellant must make a substantial showing either of prejudice or of facts "involv[ing] such a probability that prejudice [resulted] that [the trial] is deemed inherently lacking in due process." *Parker v. Gladden,* 385 U.S. 363, 365, 368, 87 S.Ct. 468, 471, 17 L.Ed.2d 420 (1966) (per curiam). *See also Sheppard v. Maxwell,* 384 U.S. 333, 352, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas,* 381 U.S. 532, 542–43, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Rodriquez v. Estelle,* 536 F.2d 1096, 1098 (5th Cir. 1976).

Appellant has not made such a showing. While we agree that the newspaper articles[17] printed in the wake of the three acquittal verdicts contained prejudicial information,[18] the record does not clearly es-

16. The trial judge stated to defense counsel that he had not seen the news accounts himself and believed they only reported the verdicts.

17. The articles in question were never presented to the trial court and consequently are not in the record. We are aware of their contents only because they are appended to appellant's brief. Ordinarily we would refuse to consider any matter outside the record in deciding a case. Furthermore, the government does not dispute that the articles attached to appellant's brief are the ones which the jury could have been exposed to, and there is apparently no objection from the government to our considering them as grounds for reversal. We therefore in our discretion will consider them as properly before us.

18. Articles appeared in both the Washington *Star* and the Washington *Post* recounting the jury's "not guilty" verdicts announced on No-

tablish that the two jurors actually read them. As we read the record, it appears that one juror heard something on the radio about the case, and that another "heard it on the news."[19] Even if our interpretation of the record is incorrect, however, the jurors' reading of these articles would not involve such a probability of prejudice that due process must be deemed lacking. There were repeated admonitions from the bench to try the case solely on the evidence presented in court. Furthermore, the jury already knew from Ms. Valdez' testimony that appellant had previously committed, and been arrested and tried, for robbery and assault and battery.[20]

We attach considerable significance to the fact that, after raising the publicity question, defense counsel failed to move for a mistrial or otherwise object to the court's method of handling the matter.[21] The jury had already acquitted appellant of three major charges and defense counsel in all probability concluded it was prudent to continue to completion with that jury. As a matter of fact, the jury then proceeded to acquit appellant of the assault charge and convict of the burglary count. Appellant should not now be permitted to profit because the tactical decision failed to result in total acquittal. We conclude that there were no "indications in the totality of circumstances that [the] trial was not fundamentally fair." *Murphy v. Florida*, 421 U.S. 794, 799, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975).

### V.

Appellant urges, also for the first time on appeal,[22] that the trial court's handling of communications with the jury had the effect of coercing a verdict and violated Super.Ct.Cr.R. 43.

During the second day of jury deliberations, the court received notes from the foreman stating that the jury could not reach a verdict. In response the trial judge sent back three notes to the jury out of the presence of appellant and defense counsel. These notes were to the effect of "please keep trying." The court informed appellant and defense counsel of this exchange of notes before the verdict was returned. No objection was made. Subsequently, and with the participation of defense counsel, the court sent several notes to the foreman concerning the deliberations requesting "yes or no" answers. The bailiff was directed to deliver these notes and to make sure the foreman understood them. Immediately after the last note was delivered, the jury returned verdicts of not guilty on the three homicide charges. The jury was then excused for the evening. At the end of the following day it convicted appellant on the burglary charge.

 Appellant's contentions are without merit. As we held in *Smith v. United States*, D.C.App., 389 A.2d 1356, *cert. denied*, 439 U.S. 1048, 99 S.Ct. 726, 58 L.Ed.2d 707 (1978), while the right of presence (Rule 43) is one which by its nature should be scrupulously observed, "failure to comply with Rule 43 does not [necessarily] require automatic reversal and may in the proper circumstances be harmless error." *Id.* at 1361. *Accord, Rogers v. United States*, 422

---

vember 22. (Appendix "A" in Appellant's Brief). In addition to summarizing the evidence in the case, the *Star* also reported that:

[Appellant] was released on probation in January after having served five years of a fifteen-year sentence for armed robbery in West Virginia. Federal authorities also said he had been convicted earlier for assault with a dangerous weapon in Ohio but was released on parole in 1968 after serving four years in prison.

Similarly, the *Post* reported that appellant was a parole violator and had served part of a sentence for armed robbery in West Virginia. (Appellant's Brief, Appendix "A".)

**19.** Nowhere in the record or on appeal does appellant relate the contents of these radio or t.v. reports.

**20.** The fact that there had been a previous trial on these charges was brought out on cross-examination of Ms. Valdez by defense counsel.

**21.** This distinguishes this case from *Coppedge, supra.*

**22.** We will nevertheless explore this contention also, for the reason earlier stated.

U.S. 35, 40, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975); *Quarles v. United States*, D.C.App., 349 A.2d 690, 691 n. 3 (1975), *cert. denied*, 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795 (1976); *Springs v. United States*, D.C.App., 311 A.2d 499, 500 n. 1 (1973); *United States v. Diggs*, 173 U.S.App.D.C. 95, 104, 522 F.2d 1310, 1319 (1975), *cert. denied*, 429 U.S. 852, 97 S.Ct. 144, 50 L.Ed.2d 127 (1976); *Walker v. United States*, 116 U.S.App.D.C. 221, 322 F.2d 434 (1963), *cert. denied*, 375 U.S. 976, 84 S.Ct. 494, 11 L.Ed.2d 421 (1964); *United States v. Glick*, 463 F.2d 491 (2d Cir. 1972).

■ This is such a case. Contrary to appellant's contention, this particular action of the court could hardly have coerced a guilty verdict which the jury was reluctant to give. The message "please keep trying" had no more coercive potential than did the court's message to the jury in *United States v. Diggs, supra* 173 U.S.App.D.C. at 105, 522 F.2d at 1320 ("All I can say is that you should consider your deliberations."), and it certainly had less potential for coercion than did the message given in *Nelson v. United States*, D.C.App., 378 A.2d 657, 660 (1977) ("This is a very serious matter, and I don't know of any reason under the sun why you cannot come to a unanimous verdict in this case, and at this moment I remain convinced that you can . . . ."). The significant fact is the notes may have benefited appellant since the jury acquitted him of the three homicide charges less than an hour after the last of the messages was received. Their effect was then attenuated because the jury was discharged for the evening and did not return a guilty verdict on the burglary charge until late the following afternoon. *See Nelson v. United States, supra*, at 661. Given appellant's failure to object before the verdicts were rendered, "the conclusion would seem inevitable that no prejudice was then perceived, and we see none now." *United States v.*

*Diggs, supra* 173 U.S.App.D.C. at 105, 522 F.2d at 1320.

■ Regarding appellant's remaining contention, since there was no objection below appellant must show that the trial court's use of the bailiff to deliver notes to the foreman either prejudiced him or denied him due process. All the notes were formulated with defense counsel's assistance and delivered in his presence. The purpose of the notes was to ascertain which charges the jury had reached agreement on and whether their agreement was unanimous. Oral statements by the bailiff were to be limited to explaining that the judge wanted a "yes or no" answer and to telling the foreman to sign his responses. All the notes were saved. While irregular, this procedure did not deprive this appellant of his right to confront witnesses against him. *Compare Parker v. Gladden*, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (per curiam) (bailiff remarked to jurors in reference to defendant, "Oh, that wicked fellow, he is guilty"). Nor do we see prejudice from it since the jury immediately thereafter acquitted appellant of the homicide charges and did not return the guilty verdict for burglary until late the next day. We also conclude that the trial judge's conduct, performed with full concurrence of defense counsel, did not "involve[] such a probability that prejudice will result that it is deemed inherently lacking in due process." *Estes v. Texas, supra* 381 U.S. at 542–43, 85 S.Ct. at 1633. We therefore see no basis for reversal because of the court's handling of communications with the jury.[23]

*Affirmed.*

---

**23.** We have also examined appellant's other two arguments for reversal and find them to be without merit. Inconsistent jury verdicts are permissible. *United States v. Dotterweich*, 320 U.S. 277, 279, 64 S.Ct. 134, 88 L.Ed. 48 (1943); *Dunn v. United States*, 284 U.S. 390, 393–94, 52 S.Ct. 189, 76 L.Ed. 356 (1932); *Steadman v.*

*United States*, D.C.App., 358 A.2d 329, 332 (1976); *United States v. Fox*, 140 U.S.App.D.C. 129, 131–32, 433 F.2d 1235, 1237–38 (1970). The evidence amply supported a conviction of first-degree burglary. (Appellant's Brief at 32–35.)