George A. BARTLEY (No. 85–109)

and

Peter J. Hackett (No. 85–1586), Appellants,

v.

UNITED STATES, Appellee.

Nos. 85–109, 85–1586.

District of Columbia Court of Appeals.

Argued April 9, 1986.
Decided Aug. 31, 1987.

Robert M. Greenspan, Washington, D.C., for appellants.

Linda S. Chapman, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Michael W. Farrell, Thomas J. Tourish, Jr., and Richard Kaplan, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before NEBEKER, MACK and STEADMAN, Associate Judges.

NEBEKER, Associate Judge:

Appellants George Bartley and Peter Hackett were charged in a six count indictment with armed robbery, D.C.Code §§ 22–2901, –3202 (1981), and two counts each of assault with intent to rob while armed, *id.* § 22–501. Each of the six counts was charged alternatively, it being alleged that appellants were armed with either a pistol, *id.* § 22–3202(a) or with a pistol or imitation thereof, *id.* They were found guilty of armed robbery while armed with an operable pistol, and two counts each of assault with a deadly weapon.[1] On appeal, they claim that the trial court erred in admitting evidence of another armed robbery committed by them in Maryland. They also contend that the court abused its discretion in refusing to impose sanctions on the government for its failure to preserve a tape recording of a 911 call made by one of the victims of the robbery in the District of Columbia. Additionally, they claim that the evidence was insufficient to show that the pistols used in the robbery were operable. And finally that the trial court misstated the law on proof of intent in its final instruction to the jury. We affirm.

I

*The Saferight Robbery*

On the afternoon of September 21, 1983, the Saferight grocery store, a discount store owned by Giant Food, located at 300 Riggs Road, N.E., was robbed by two armed men. Jeffrey Charles, a produce clerk at Saferight, was stocking shelves in the produce area when he noticed two men standing near the store's office, approximately twenty feet away.[2] Charles took note of these men because they had been in the store approximately seven minutes earlier. They had walked around in the produce section, but had left the store without making a purchase. Charles now observed the two men standing near the door to the office, looking around and checking a watch that one of the men was wearing. At that point, Fay Sampson, the assistant manager, entered the booth. As the door closed behind her, one of the men, later identified as appellant Hackett, attempted to grab the door knob, but was unsuccessful as the door closed and locked. Hackett then jumped up onto the booth and attempted to crawl over the top of the door. Charles, realizing that something was amiss, started to walk away from the booth towards the rear of the store. He was stopped, however, by the second man, later identified as appellant Bartley. Bartley, exhibiting a pistol in his waistband, told Charles to come back.

Sampson, who was alone in the booth, was about to exit when she saw a hand come over the top of the door. She shoved the door, and tried to exit, but was stopped by Hackett, who, "wav[ing]" his gun, ordered Sampson back inside. Once he and Sampson were in the booth, Hackett demanded money. He reached for the mailbag and told Sampson to put the money inside. For the next two or three minutes, Hackett held his gun, while he and Sampson emptied the cash pans into the mailbag.

---

1. The trial court granted defense motions to dismiss the four assault with intent to rob charges. However, the jury was instructed as to each count on the lesser included offense of assault with a deadly weapon.

2. The office is located near the front of the store. It consists of a booth with seven foot high walls, and two steps that lead up to a single door that locks automatically as it closes. Inside the booth are a safe which holds money and register cash pans, a desk, and a file cabinet. A mailbag is kept hanging on the back of the door until approximately 9:30 p.m. each evening, when its contents are emptied and placed in the mail.

During that time, Hackett was no more than a foot away from Sampson.[3]

Charles Tippett, the produce manager, heard the commotion in the office and started toward the telephone to call the police. Bartley approached Tippett from behind and told him to "stay out of it unless you want to get hurt." Soon thereafter, customers began to come into the store. This prompted Bartley to warn Hackett (who was still in the booth) by yelling; "[m]anager, manager, we got company. It was [sic] getting busy down here." Hackett then emerged from the booth and he and Bartley fled out the front door and around the back of the store. They were last seen running over a hill behind the store.

After Bartley and Hackett had made good their escape from the store, Sampson called the police and described both robbers, using information supplied by Tippett to describe Bartley.[4] A police radio run containing a description of the robbers was then broadcast.[5]

Detective Vernon Jones arrived at the Saferight approximately twenty minutes after the robbery and interviewed Sampson, Charles, and Tippett. Sampson described the robber who came into the booth as a black male in his early twenties, about six feet tall, 160 pounds with close cut hair and no facial hair. He was wearing a blue plaid shirt, blue jeans and was armed with a small revolver. Charles described the robber who held him and Tippett at gunpoint as a black male, twenty-three or twenty-four years old, six feet one inch tall, 160 pounds, short, close-cut hair and a full beard. He was wearing a gray sweat jacket, blue jeans and was armed with a small black revolver. Tippett was unable to describe any physical characteristics of the robbers.

## II

### *The Giant Food Store Robbery*

One week later, on the afternoon of September 28, 1983, Bartley and Hackett were apprehended after robbing the Giant Food store located at Riverdale Plaza in Prince Georges County, Maryland. On that day, cashier Wilda Hilly was on her way to the office when Bartley came up behind her, stuck a gun into her back and told her to step into the office.[6] As Hilly was being forced into the office, she noticed another man standing at the office door. Once inside, Bartley told Hilly and Revas Tilly, another employee who was already in the office, to take the mailbag off the door, empty its contents, and fill it with money from the cash pans in the safe.

While Hilly and Tilly were complying with Bartley's demand to empty the safe, Lorenzo Taylor, a third employee, started towards the office to investigate the suspicious activity going on inside. As he approached the office, he saw Hackett standing outside the door. At that point, without being seen by either Bartley or Hackett, Taylor ran to the rear of the store to call the police.[7]

---

**3.** Sampson recalled seeing Hackett earlier in the store. While walking behind the office a few moments before the robbery, Sampson was approached by Hackett and asked if Saferight carried watch batteries. She replied they did not, and suggested that he try another store.

**4.** Sampson never saw Bartley. In fact, she was unaware until after the robbery that anyone other than Hackett was involved.

**5.** Some initial confusion surrounded the radio broadcast. Apparently there were two robberies that day. The robbery at the Saferight store and another robbery, close in time, of a Safeway store. Four different individuals, two at each store, were involved in these two robberies. However, the broadcast apparently created some initial confusion as to whether the same two individuals had robbed both stores. However, the robbers of the Safeway store, unlike appellants here, were described as having been armed with shotguns.

**6.** The office in this store is also a small booth near the cash registers in front of the store. It contains a safe and a mailbag that hangs on the back of the door.

**7.** Taylor had seen Bartley and Hackett in the store earlier. Five or ten minutes before the robbery, Taylor had observed appellants in an aisle "staring into space." As Taylor walked by them, Bartley asked for some Jello products. Taylor pointed to the Jello display and continued down the aisle. Taylor thought the question was odd given the fact that Bartley and Hackett were directly in front of the display.

Officer Steve Grimes of the Prince Georges County Police was on patrol near the Riverdale Plaza Shopping Center when he received a broadcast regarding the robbery of the Giant store. He drove to the rear of the shopping center, where, less than a minute after receiving the broadcast, Bartley ran directly across his path, away from the store. After a short chase, Bartley was apprehended as he climbed into a car in which Hackett was already seated. Recovered from the car were two small handguns and the mailbag, which contained rolls of coins and currency. Both Hackett and Bartley pled guilty to the charges arising out of the Maryland robbery.

### III

■ Prior to trial, the government sought to introduce the evidence of the Maryland robbery on the grounds that it showed the identity of the robbers and a common scheme or plan. Appellants objected then, as they do now, on the grounds that the two crimes were not in any way unique. Rather, appellants argue that these robberies were committed in a manner that would suggest itself to any pair who considered such an enterprise. So viewed, argue appellants, the Maryland robbery offers no relevant evidence as to either identity or the existence of a common scheme or plan. We disagree.

Our starting point is *Drew v. United States*, 118 U.S.App.D.C. 11, 15–16, 331 F.2d 85, 89–90 (1964), which sets forth the relevant concerns:

It is a principle of long standing in our law that evidence of one crime is inadmissible to prove *disposition* to commit crime, from which the jury may infer that the defendant committed the crime charged. Since the likelihood that juries will make such an improper inference is high, courts presume prejudice and exclude evidence of other crimes unless that evidence can be admitted for some substantial, legitimate purpose....

Evidence of other crimes is admissible when relevant to (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other, and (5) the identity of the person charged with the commission of the crime on trial. When the evidence is relevant and important to one of these five issues, it is generally conceded that the prejudicial effect may be outweighed by the probative value. [Footnotes omitted; emphasis in original.]

The admission of other crimes evidence "need not depend on the presence of one distinctive similarity but the court can consider the totality of the factual circumstances which, amalgamated, lay a sufficient basis for admission under the *Drew* doctrine." *Gates v. United States*, 481 A.2d 120, 123 (D.C.1984); *Warren v. United States*, 436 A.2d 821, 833 (D.C.1981). The probative value of the evidence must be weighed against its prejudicial effect. *Willcher v. United States*, 408 A.2d 67, 75 (D.C.1979). We will reverse the trial court's decision to admit the evidence only if it was an abuse of discretion to do so, *Gates v. United States, supra,* 481 A.2d at 123, for it is generally conceded that undue prejudicial effect may be outweighed by the probative value. *Drew v. United States, supra.*

In dealing with this issue, the trial court and the parties have used the phrase "common scheme or plan" as an alternative theory of admissibility of the Maryland store event. We view the evidence of that robbery, that is the particular way in which it was executed, as proof of identity. It is the commonality of detail or "plan/scheme" which reveals a particular knowledge and use of office layout that is more probative than unduly prejudicial. We note that identity was an issue of concern since there had been a line-up misidentification by one witness and unsureness of identity by others.

Both robberies occurred in the afternoon at grocery stores owned by the Giant Food store chain.[8] Both stores had similar floor

8. By our reliance upon this factor, we do not mean to suggest that appellants were aware of

plans, insofar as the office, which contained the store's safe, cash pans and a convenient mailbag was located in a booth at the front of the store. The *modus operandi* in both robberies was the same: in each, the men entered the store, loitered for awhile and asked a question of a store employee. Then one of the men forced his way into the office at gunpoint, while the other waited directly outside of the office and acted as a lookout. Once in the office, the robber demanded that the cash in the safe be emptied into the store's mailbag, which in both cases, was readily available on the door inside the office. Finally, when the robbers fled, they ran out the front door and around to the rear of the building.

Also significant is the fact that both robberies occurred within one week of each other. *See, e.g., Gates v. United States, supra,* 481 A.2d at 123 (rape and murder followed by assault nineteen days later); *Brooks v. United States,* 448 A.2d 253, 257 (D.C.1982) (rapes occurring nine days apart). Taken in their entirety, "the calculus of these factors establishes a sufficient basis for the ... identity [prong] of the *Drew* test." *Gates v. United States, supra,* 481 A.2d at 124.[9]

In addition, numerous steps were taken during the trial to impress upon the jury the limited use to which the evidence could be put. At several points, the jury was told that the evidence of the Maryland robbery was admitted to show only intent, identity or common scheme or plan, and not to show a predisposition toward criminal acts.

First, the jurors were examined during *voir dire* as to whether each felt that he or she could apply the evidence in the prescribed manner. Second, immediately following the empaneling of the jury, the

court instructed them on the limited use of the evidence concerning the Maryland robbery. Third, prior to receiving any testimony relating to the Maryland robbery, the court gave a cautionary instruction to the jury, again emphasizing the limited use of the evidence. Fourth, the government, in its closing argument, mentioned the limited use of the evidence, and referred the jury to the trial court's previous instructions. Finally, the trial court, in its final charge to the jury, again emphasized that the evidence was to be used only to determine identity or common scheme or plan, and for no other purpose.

These prophylactic steps taken by the court and counsel during the *voir dire,* prior to the presentation of evidence, in closing argument and instructions, "could only reinforce in the jurors' minds that the incidents were separate and the other crimes evidence was admissible only for the prescribed, limited purposes." *Gates v. United States, supra,* 481 A.2d at 124. Accordingly, we conclude that the trial court did not abuse its discretion in admitting the evidence of the Maryland robbery.

## IV

Appellants next contend that the trial court abused its discretion in failing to impose sanctions on the government following the government's failure to preserve certain Jencks material. Specifically, appellants claim that the government's erasure of a tape recording containing Fay Sampson's 911 emergency phone call to the police warranted the striking of Sampson's subsequent trial testimony. We disagree.

The government has the duty to preserve statements of witnesses covered by the

the corporate structure of a large supermarket chain. However, the evidence established that all of the supermarkets owned by Giant Food had similar floor plans at least insofar as the location and structure of the store office. It is reasonable to conclude that although Bartley and Hackett may have been unaware of the corporate relationship between the two stores, they were aware of the resulting similarities in design as design facilitated their criminal venture.

9. *Ali v. United States,* 520 A.2d 306 (D.C.1987), is not to the contrary for here there is no shift of theories or admissibility at the appellate level which precluded earlier trial court ruling and limiting instructions. Moreover, this case presents a clear identity predicate for the evidence whereas *Ali* involved predisposition for other deviate sexual acts. See the concurring opinion therein by Chief Judge Pryor and Judge Rogers.

Jencks Act, 18 U.S.C. § 3500 (1982).[10] *Montgomery v. United States*, 384 A.2d 655, 661–62 (D.C.1978). This duty extends not only to the prosecutor, but to the government as a whole, including investigative agencies. *Id.*

The duty of preservation is violated when such evidence is lost or destroyed as a result "of either negligence or purposeful destruction accompanied by either bad motive or bad judgment." *Id.* (quoting *United States v. Perry*, 153 U.S.App.D.C. 89, 99, 471 F.2d 1057, 1067 (1972)).

A finding of improper destruction, however, does not require that sanctions automatically be imposed. *Cotton v. United States*, 388 A.2d 865, 870 (D.C.1978); *United States v. Perry, supra*, 153 U.S.App. D.C. at 100, 471 F.2d at 1068. Rather, once a violation of the rule of preservation is found, "the totality of the circumstances" must be considered in determining what sanctions to apply. *Montgomery v. United States, supra*, 384 A.2d at 662; *Williams v. United States*, 385 A.2d 760, 763 (D.C. 1978). When a discoverable statement has been lost or destroyed, the trial court "must weigh certain factors in exercising its discretion whether to strike a witness' testimony." *Fields v. United States*, 368 A.2d 537, 541 (D.C.1977) (quoting *Hardy v. United States*, 316 A.2d 867, 870 (D.C. 1974)). The factors to be considered are (1) the degree of negligence or bad faith involved, (2) the importance of the evidence lost, and (3) the evidence of guilt adduced at trial. *Cotton v. United States, supra*, 388 A.2d at 869. Thus, we must assess the degree of prejudice suffered by the defense as a result of the erasure of the tape, and decide whether the trial court abused its discretion in deciding not to strike Sampson's testimony.

There is nothing in the record to suggest that the erasure of the tape was the result of either bad faith or a desire to conceal or destroy evidence. To the contrary, the fact that other tapes in addition to the one at issue here were erased supports the trial court's finding that the erasure was merely an administrative decision. While the erasure was regrettable, we conclude that the loss of the statement was not "accompanied by bad motive or bad judgment of a degree which could warrant refusal to allow an [eyewitness] to give testimony identifying [one of the robbers]." *Williams v. United States, supra*, 385 A.2d at 763.

In addition, we conclude that any possible prejudice that appellants may have suffered as a result of the erasure of the tape was not of a degree sufficient to exclude Sampson's testimony.

With regard to appellant Bartley, because the description of him given by Sampson over the telephone was not from her own recollection, but from that of Charles Tippett, the tape would have been of no impeachment value. With regard to both appellants, the record reveals that a transcript of the 911 call was made available to counsel prior to trial. In addition, counsel was also provided with a tape of the radio run that followed Sampson's call, and the notes of the first officer to interview Sampson on the scene only twenty minutes after the robbery.

We conclude that although the evidence of guilt in this case was not overwhelming, to impose Jencks sanctions here, where all of the above was available to counsel for effective cross-examination, would be the type of "automatic reaction to the unavailability of a statement" as "would restrict rather than enhance the quest for truth." *Washington v. United States*, 343 A.2d 560, 563 (D.C.1975).

V

■ Appellants also contend that the evidence was insufficient to permit the jury to conclude that the weapons used in the robbery were operable.

When Hackett and Bartley entered the Saferight store, each displaying a weapon to back up his demands, they both must

10. We assume, as have the parties, that the recording contained a statement required to be produced pursuant to 18 U.S.C. § 3500(e). Accordingly, we will address only the correctness *vel non* of the court's decision not to impose sanctions upon the government following its nonpreservation of the recording.

have intended that their victims believed that the weapons were capable of being discharged. Just as it would have been reasonable for the Saferight employees to believe that appellants' weapons were operable, so too would it be reasonable for the jury to conclude likewise. *Morrison v. United States*, 417 A.2d 409, 413 (D.C. 1980).

Appellants' final contention is that the trial court committed plain error by instructing the jury that it "may" infer that a person ordinarily intends the natural and probable consequences of his acts. This claim has no merit. *See Lannon v. Hogan*, 719 F.2d 518, 521 (1st Cir.1983), *cert. denied*, 465 U.S. 1105, 104 S.Ct. 1606, 80 L.Ed.2d 136 (1984).

Accordingly, the judgments of conviction are

*Affirmed.*

MACK, Associate Judge, dissenting:

Undeniably a good deal of confusion surrounds the admissibility of other crimes evidence. The name of the doctrine itself and the scope of its applicability contribute to the confusion. The resolution of the today's issue, however, does not implicate the gray or discretionary areas of the law. In my view, the majority's disposition and reasoning are irreconcilable with the leading case in this jurisdiction. *Drew v. United States*, 118 U.S.App.D.C. 11, 18–19, 331 F.2d 85, 92–93 (1964) (two robberies of High's Dairy stores committed two weeks apart on summer afternoons when no customers were in the stores by an intruder who wore sunglasses fit into such "an obvious tactical pattern" that joinder of the two offenses was prohibited on a mutual admissibility theory). I feel a compulsion to write, therefore, to attempt to clarify some of the confusion this doctrine engenders.[1]

## I.

### A.

The danger of the majority's approach to these questions is that it runs the risk of converting the law in this jurisdiction from a presumption of the exclusion of other crimes evidence to a presumption of admissibility upon a simple showing of some similarity between the charged and uncharged crimes. The conversion can result in the admission of this extraneous evi-

---

1. As to the name and scope of applicability, the word "other" in the so-called other crimes evidence doctrine refers to a crime which is "other than" the crime or crimes specified in the indictment or complaint which forms the basis of the conviction appealed from. There are, however, two limitations of this definition. First, even if the crime is uncharged in the indictment, if it forms a part of the "immediate surrounding circumstances" of the charged crime, it falls outside the "other" crimes evidence doctrine because it is "too intimately entangled with the charged criminal conduct." *Toliver v. United States*, 468 A.2d 958, 960 (D.C.1983); *see Green v. United States*, 440 A.2d 1005 (D.C.1982). Furthermore, even if the crime is technically uncharged in the indictment, if the "other" crime is a crime which forms a part of the charged crime, the other crimes evidence doctrine is inapplicable. *See Ali v. United States*, 520 A.2d 306, 311 n. 5 (D.C.1987) (in a crime such as conspiracy, proof of a pattern or plan of criminal activity provides direct proof of one of the elements of the crime and thus invocation of the "common scheme or plan" exception to the other crimes evidence doctrine is unnecessary); E. IMWINKELRIED, UNCHARGED MISCONDUCT EVIDENCE § 2:10, ch. 2 at 29 (1984) (hereinafter "IMWINKELRIED") (describing examples such as felony mur-

der and RICO where proof of the underlying felony or proof of a criminal enterprise, respectively, is necessary to proof of the charged crime).

The word "crime" is not strictly limited to acts which constitute crimes; however, "the acts portrayed must be minimally in the nature of a criminal offense" in order to invoke the doctrine. *Wheeler v. United States*, 470 A.2d 761, 769 (D.C.1983). *Cf.* FED.R.EVID. 404(b) (utilizing the terms "crimes, wrongs, or acts"). Furthermore, the "crime" need not be established by the defendant's conviction for it, but "clear and convincing evidence" must demonstrate the defendant's perpetration of the uncharged acts. *United States v. Bussey*, 139 U.S.App.D.C. 268, 273, 432 F.2d 1330, 1335 (1970).

Finally, under the other crimes evidence doctrine, the evidence of other crimes is offered as substantive proof of the defendant's guilt on the crime charged. When evidence of other crimes is offered to impeach a witness' credibility, including the credibility of a defendant who takes the stand, the doctrine regarding impeachment evidence, not the other crimes evidence doctrine, is applicable. *See, e.g., Dorman v. United States*, 491 A.2d 455 (D.C.1985) (en banc); *Sherer v. United States*, 470 A.2d 732 (D.C.1983); D.C.Code § 14–305 (1981).

dence for the sole purpose of generating an inference of criminal propensity or predisposition to commit a certain type of crime rather than another. Three analytical flaws lead the majority in this direction.

First, the majority resorts to an unrefined "prejudice versus probative value" test in determining admissibility. *See ante* at 695. There is no question that the ultimate, general test in determining admissibility is "prejudice versus probative value." But, because of the nature of other crimes evidence, it is generally conceded that such evidence is always *both* prejudicial and probative to some degree. Thus, in the other crimes evidence area, an undistilled application of a generalized test such as "prejudice versus probative value" begs the real questions. The real questions are: by means of what inference is other crimes evidence probative of guilt, and is that inference independent of and weightier than the self-generating, inherently prejudicial propensity inference?

Second, the majority fails to recognize the presumptive irrelevance of other crimes evidence. Uncharged acts, after all, are collateral; they are unconnected to the historical events which form the bases of the charged crime. Thus, it is not only inherent prejudice which must be overcome in justifying admission of other crimes evidence, but also, irrelevance.[2]

Third, the majority fails to deal with what can best be characterized as the use of a "shotgun" approach to admissibility. *See State v. Bly*, 215 Kan. 168, 176, 523 P.2d 397, 405 (1974). Under the "shotgun" approach, several of the possible so-called "exceptions" to the general rule of exclusion are asserted on the hopes that one of them might be appropriate. The so-called "exceptions" become:

> passports to admissibility, magic formulae, and shibboleths. If the plaintiff or prosecutor mentions one [or more] of the accepted exceptions, the courts adopt an "open sesame" policy and routinely admit the evidence *without analyzing the logical relevance issue in depth.*

IMWINKELRIED, *supra* note 1, § 2:29, ch. 2 at 68 (footnotes omitted) (emphasis added).

Here, before and during the trial, the jury was told four times that the evidence of the Maryland robbery was admitted to show *only* "intent, identity or common scheme or plan." They were instructed on all three of these "exceptions" as well. On appeal, the government argues admissibility on the basis of identity and common scheme or plan. The majority seems to affirm the admission on the basis of identity. *See ante* at 695. Not once in all this time has there been any analysis of the underlying theory by which the evidence of the Maryland robbery is probative of the identity of the Saferight robbers *independent of* its obvious power to demonstrate appellants' possible propensity to commit supermarket robberies.[3]

The shotgun approach was implicit in some earlier cases in this jurisdiction. *See Bridges v. United States*, 381 A.2d 1073 (D.C.1977) (evidence of four rapes mutually admissible under either identity or common scheme exceptions); *Gates v. United States*, 481 A.2d 120 (D.C.1984) (government introduced previous rape/murder to show identity, intent and common scheme and this court affirmed on the basis of identity and common scheme). These cases were not wrongly decided. To the con-

---

**2.** Perhaps the majority's failure to recognize the presumptive irrelevance of the evidence is due in some part to this court's historic emphasis on the presumptive prejudice of the evidence. Indeed, most of the case law in this jurisdiction has recognized the presumptive prejudice of other crimes evidence. *E.g., Graves v. United States*, 515 A.2d 1136, 1139 (D.C.1986); *Campbell v. United States*, 450 A.2d 428, 431 (D.C. 1982); *Calaway v. United States*, 408 A.2d 1220, 1226 (D.C.1979); *Crisafi v. United States*, 383 A.2d 1, 3 n. 2 (D.C.), *cert. denied*, 439 U.S. 931, 99 S.Ct. 322, 58 L.Ed.2d 326 (1978); *United States v. Bussey, supra* note 1, 139 U.S.App.D.C. at 271, 432 F.2d at 1333; *Drew, supra,* 118 U.S.App.D.C. at 15–16, 331 F.2d at 89–90. This emphasis on prejudice has perhaps inadvertently detracted from a greater appreciation of the fact that uncharged acts are collateral.

**3.** My reference to the "other crimes evidence" relates to evidence of the Maryland robbery. The robbery which is the subject of appeal will be referred to as the "Saferight robbery."

trary, in both these cases, the other crimes evidence was properly admitted because a distinct and unique modus operandi generated the permissible inference that the perpetrators of the uncharged crimes were one and the same as the perpetrators of the charged crimes. However, the unexamined and unexplained assertion in those cases that one or more of the other exceptions could be properly invoked is partially responsible for today's disposition, which fails to isolate and address the evidentiary basis for the admissibility of this evidence. *Cf. Campbell v. United States, supra* note 2, 450 A.2d 428 (this court systematically rejected the government's "shotgun" argument that the other crimes evidence was admissible to show intent, motive, identity, and the surrounding circumstances of the offense).[4]

It is not that the so-called "exceptions" are necessarily mutually exclusive. Rather, the shotgun approach is fundamentally flawed because it engenders a habitual reliance on the mechanical invocation of one or more "exceptions" while simultaneously obscuring the true sequence of logical inferences upon which the proper admission of this extrinsic and prejudicial evidence is predicated. This obfuscation results in the perhaps unintentional admission of this evidence for propensity purposes.

### B.

The introduction of other crimes evidence is justified when (1) that evidence generates an inference of a defendant's greater likelihood of guilt for a reason independent of the inherent power of that evidence to generate an inference of guilt based on propensity or criminal predisposition; and (2) the probative value of the legitimate inference outweighs the prejudicial effect of the self-generating propensity inference. A proper understanding of the evidentiary functions of the so-called *Drew* "exceptions" sheds considerable light on how a legitimate inference may be generated and why the shotgun approach can lead to admissibility even if the only inference generated is propensity.[5]

It is commonly believed that with the decision in *Drew*, this jurisdiction adopted the "exclusionary" view of the admissibility of other crimes evidence. Under that view, evidence of other crimes is presumed inadmissible unless it fits within one of the so-called "exceptions" to the general rule of exclusion: motive, intent, absence of mistake or accident, common scheme or plan, and identity. *Drew, supra,* 118 U.S. App.D.C. at 16, 331 F.2d at 90. While *Drew* is and of course remains good law, that case is not, and indeed never purported to be, the starting point for the analysis of the admission of other crimes evidence.

Instead, this court has developed a four step approach to these questions to assure that a legitimate, non-propensity inference is generated. The approach is also a guide for assisting in determining *when* the probative value of the legitimate inference outweighs the prejudicial effect of the self-generating propensity inference.

In order to rebut the presumption of exclusion, the proponent of other crimes evidence must first prove by clear and convincing evidence that the defendant was the perpetrator or co-perpetrator of the

---

**4.** It is impossible to avoid observing the government's utilization of the shotgun approach in some instances. A prosecutor will occasionally invoke two or more of the "exceptions" relying on the trial court's adoption of at least one of them. Given the generally high quality of prosecution in the District, the government can be expected to more fully explain the specific, legitimate theory or theories of relevance which allegedly support the admission.

**5.** I will continue to intermittently refer to the *Drew* list as "exceptions." While the word "exception" appropriately captures the idea that other crimes evidence is presumptively exclud-

ed, as I hope to demonstrate here, the word is perhaps conceptually inappropriate as a description of the evidentiary functions of the five categories in *Drew*.

In fact, a true "exception" to *Drew* occurs when the only inference generated by the other crimes evidence is disposition or propensity, and the evidence is expressly admitted for those purposes. *See Pounds v. United States,* 529 A.2d 791, 793 (D.C.1987) (evidence of previous sexual contact between defendant/father and complainant/child admissible on theory of "predisposition to gratify special desires with that particular victim").

uncharged crime. *E.g., United States v. Bussey, supra* note 1, 139 U.S.App.D.C. at 273, 432 F.2d at 1335 ("the court should also have conducted an initial inquiry, out of the jury's presence, to determine that the defendant was connected with the other crime by 'clear and convincing evidence' "); *see Light v. United States,* 360 A.2d 479, 480 (D.C.1976). Then, the proponent must identify the contested issue of the charged crime to which the evidence of the uncharged crime is directed, that is, the ultimate issue upon which the evidence of other crimes allegedly makes more probable the defendant's likelihood of guilt on the charged crime. *E.g., Graves, supra* note 2, 515 A.2d at 1140; *Campbell, supra* note 2, 450 A.2d at 430; *Willcher v. United States,* 408 A.2d 67, 76 (D.C.1979) ("an issue [must be] raised on which other crimes evidence could be received"). Next, the proponent must articulate an independent theory of logical relevance: how the contested issue in the case can be inferred from the other crimes evidence independent of its power to generate an inference of defendant's propensity or criminal predisposition. *Drew, supra,* 118 U.S.App.D.C. at 16, 331 F.2d at 90 (evidence of other crimes is excluded unless "that evidence can be admitted for some substantial, legitimate purpose"); *see Ali v. United States, supra* note 1, 520 A.2d at 310 n. 4; *Willcher, supra,* 408 A.2d at 75 ("unless the evidence of prior 'bad acts' is introduced for a legitimate purpose, its probative value is presumed to be outweighed by the prejudicial effect"); *see generally* 2 J. WEINSTEIN, EVIDENCE ¶ 404[08] (1986) (hereinafter "WEINSTEIN") (describing the proponent's burdens). Finally, the trial court must still independently determine whether the prejudicial effect of the evidence outweighs its probative value. *Graves, supra* note 2, 515 A.2d at 1139 (citing *Campbell, supra* note 2, 450 A.2d at 430); *Minick v. United States,* 506 A.2d 1115, 1119 (D.C.), *cert. denied,* —— U.S. ——, 107 S.Ct. 133, 93 L.Ed.2d 76 (1986).

There is nothing unusual or "extraordinary" about these requirements. Indeed, the proponent's "burden" consists in demonstrating the relevance, materiality, and lack of undue prejudice of the evidence. Without clear and convincing evidence that the defendant committed the uncharged crime, the bad act is simply irrelevant: crimes possibly committed by persons other than the defendant cannot be probative of the defendant's guilt and the extreme prejudice is obvious. Furthermore, a contested issue must be identified because other crimes evidence, like all evidence directed toward proof of the substantive merits of the charged crime, is not relevant unless probative of the elements of that crime.[6] The identified issue must be contested or "in genuine controversy" because other crimes evidence directed to an uncontested, immaterial or merely "formal" issue would have marginal probative value (since, by definition, the issue is uncontroverted) while its prejudicial effect would be great. Stated otherwise, if the issue to which the other crimes evidence is directed is not in controversy, the prejudicial effect will *per se* outweigh the probative value. *See Graves, supra* note 2, 515 A.2d at 1140 ("[i]f other crimes evidence were admissible simply because intent [for example] must be proved, whether the defendant contests it or not, then such inherently prejudicial evidence would become routinely admissible, without regard to whether the government really needed it"). Finally, the requirement of a theory of relevance independent of propensity preserves the principle that guilt is determined by acts not character and assures that the evidence is more probative than prejudicial.

While this analytical approach encompasses nothing more than normal evidentiary requirements, the express articulation of these requirements and an insistence upon compliance with the approach are necessary in the other crimes evidence doctrine for one very good reason: excluding evidence of other crimes—particularly other similar crimes—can simply be very counter-

---

**6.** Of course, evidence may be relevant to credibility in addition to relevance to substantive merits. In that case, however, the doctrine regarding impeachment evidence, and not the other crimes evidence doctrine, is applicable. *See* note 1, *supra.*

intuitive. Following the steps in this approach can assure that trial courts engage in a balancing process which might otherwise be inadvertently, but intuitively, weighted in favor of admissibility.

The so-called *Drew* "exceptions" generally form part of both the second and third steps of the analysis. "Intent" and "identity" refer to possible contested issues in any given case. Their proof is intrinsically relevant to proof of the charged crime, since intent and identity are generally elements of every crime.[7] Guilty state of mind and identity are thus two of the possible *ultimate* inferences which other crimes evidence may generate, depending upon what issue or issues are raised. *See Willcher, supra,* 408 A.2d at 75 ("[w]hether an issue has been raised for purposes of receiving other crimes evidence depends upon both the elements of the offense charged and the defense presented"). Therefore, to simply and without explanation allege that evidence of another crime is relevant to "identity" or "intent" on the charged crime is to say nothing about *how* it ·is relevant, that is, by means of what inference the other crimes evidence proves identity or intent. Regardless of whether intent or identity and/or some other issue is the contested issue(s) in a case, the proponent of other crimes evidence must articulate a theory, independent of a propensity theory, by which the evidence of other crimes proves the contested issue(s).

"Motive" and "common scheme or plan" are such theories, independent of a propensity theory, by which the contested issue may be proved. Unlike "identity" and "intent," no intrinsic relevance inheres in proof of a motive or a common scheme since proof of the elements of the charged crime will not include proof of these facts.[8] Proof of a motive or common scheme is not an end in itself, but rather, an intermediate step toward proof of the ultimate issue. The introduction of independent crimes is justified if, and only if, proof of the motive or scheme proves the perpetrator's identity, intent, or his commission of the charged crime by means of the following legitimate inference: the evidence of the motive or scheme increases the probability of a defendant's participation in the charged crime by setting him apart from others who had no such motive or scheme.

"Modus operandi," like motive and common scheme, refers to an independent theory of logical relevance by which a contested issue may be inferred. While "modus operandi" is not specifically enumerated in the *Drew* list, historically and in practice, the "identity" exception has come to mean the modus operandi theory of proof of identity. *See, e.g., Campbell, supra* note 2, 450 A.2d at 431; *Warren v. United States,* 436 A.2d 821, 832 (D.C.1981). The introduction of

---

7. Intent is sometimes not an element of statutory or regulatory crimes, which, for these purposes, is unimportant. Furthermore, intent does not become a contested issue until an affirmative defense has challenged intent. *See* note 9, *infra.* The actus reus would be the other major possible contested issue in any given case since the mens rea, the actus reus, and the identity of the defendant as the perpetrator are generally the three major elements of proof in any crime. Of course, the assertion of other affirmative defenses may indicate that another issue (such as consent in a crime like rape) is the contested issue.

8. If proof of the charged crime does include proof of a plan or scheme, the other crimes evidence doctrine is simply inapplicable. In that case, the so-called and mislabelled "other crimes" would be admissible on a theory of direct relevance because the "other" crimes form a part of the charged crime. *See* note 1, *supra* (citing examples such as conspiracy and

RICO). Furthermore, the elements of a very limited number of crimes will include the element of motive. *See, e.g.,* 18 U.S.C. § 245(b) (1982) (prosecution must prove willful injury to any person "because of his race, color, religion or national origin"). In that case, and any analogous situation where an element of the charged crime is motive, proof of other crimes establishing the illegitimate motive would be admissible on a theory of direct relevance. *See United States v. Franklin,* 704 F.2d 1183, 1187–88 (10th Cir.) (evidence of previous assault on interracial couple admissible to prove motive in prosecution under 18 U.S.C. § 245(b) (1982)), *cert. denied,* 464 U.S. 845, 104 S.Ct. 146, 78 L.Ed.2d 137 (1983). Generally, however, the common law descendant crimes within this court's jurisdiction will not include motive as an element of the crime. Therefore, in accordance with the analysis here, the proponent of the other crimes evidence must identify the contested issue which proof of a motive allegedly inferentially proves. *See* text, *infra.*

evidence of a modus is justified if, and only if, it generates the following legitimate inference: the uniqueness of the modus makes it highly likely that one and the same perpetrator committed the charged and uncharged crimes thereby establishing defendant's identity as the perpetrator.[9]

Therefore, legitimate, non-propensity inferences may be generated through compliance with the four-step approach developed by this court and through an understanding of how the *Drew* "exceptions" relate to the generation of these inferences. The shotgun approach short-circuits the process in a number of ways. First, the proponent may fail to identify a contested issue and merely assert that the introduction of the evidence "is probative of" motive, common scheme or plan, or modus operandi, although none of these are elements of the charged crime. *See Ali, supra* note 1, 520 A.2d at 310–11 (evidence of alleged sexual abuse of sister of complainant improperly introduced on a common scheme or plan theory because "common plan" was not an element of the offenses charged and therefore the only probative value of the extrinsic evidence on the contested issue of the actus reus was propensity). Second, the proponent may fail to identify the independent theory of logical relevance and simply assert that the

---

**9.** For the sake of completing the picture, "absence of mistake or accident" refers to the rebuttal of an affirmative defense based on mistake or accident. It is inextricably interwoven with invocation of the so-called "intent" exception. A defense based on mistake or accident is one possible way in which "intent" rises to the level of a contested issue in a case. A defense based on non-criminal or "innocent" intent would be another way. *Cf. Graves, supra* note 2, 515 A.2d at 1138–40 (defendants denied allegations of soliciting for purposes of prostitution by asserting their innocent presence on the street); *Willcher, supra,* 408 A.2d at 75–76.

In other words, the so-called "intent exception" generally may not be invoked unless an affirmative defense challenging intent calls intent into question. *See Graves, supra* note 2 (evidence of prior acts of soliciting for purposes of prostitution not admissible in government's case-in-chief on intent exception); *Willcher, supra,* 408 A.2d at 76; ("[t]he government properly waited until cross-examination to elicit the prior crimes evidence. Appellant opened the door through his defense ..."); *United States v. Miller,* 508 F.2d 444, 450 (7th Cir.1974) ("unless and until the defendants affirmatively [have] contested their intent," other crimes evidence based on intent may not be introduced in the government's case-in-chief). Unless an affirmative defense is asserted, intent will remain only a "formal" issue in the case: proof the defendant's state of mind will generally be inferable from proof of the defendant's commission of the actual acts.

This is true because of the nature of proof of intent. The defendant's state of mind, unlike either the actus reus or the identity of the perpetrator, is not subject to direct proof. Rather, intent must always be proved circumstantially from the totality of the factual circumstances which surround the commission of the crime. *Jones v. United States,* 516 A.2d 929, 931–32 (D.C.1987); *Shelton v. United States,* 505 A.2d 767, 770 (D.C.1986). Evidence of the factual predicates is antecedent to and equivalent to evidence of intent. If the government is unsuccessful in generating an inference of criminal intent from the factual circumstances surrounding the crime, then the only purpose for the government's case-in-chief introduction of other crimes evidence based on a theory of "intent" is the generation of the inference that because defendant acted with criminal intent before, he acted with criminal intent this time. That is, of course, the inference forbidden by *Drew.*

While, in general, the only way in which intent becomes a contested issue is through the assertion of affirmative defenses, obviously, given my analysis here, the same cannot be said with respect to the elements of identity or actus reus.

If intent becomes a contested issue through the assertion of an affirmative defense, the "absence of mistake or accident" "exception" permits the introduction of similar crimes if, and only if, the "theory of probabilities" or "doctrine of chances" inference is generated: "multiplying instances of the same result" eliminate "the element of innocent intent ... until it is perceived that this element [innocent intent] cannot explain them all." 2 WIGMORE ON EVIDENCE § 302 (Chadbourn rev. 1979); *see also* IMWINKELRIED, *supra* note 1, § 5:05, ch. 5 at 8 ("the more often the defendant performs the actus reus, the smaller is the likelihood that defendant acted with an innocent state of mind"); 2 WEINSTEIN, *supra,* ¶ 404[12]. *See generally Graves, supra* note 2, 515 A.2d 1140–44, and *Willcher, supra,* 408 A.2d at 75–77 (discussing more fully the "intent" exception). The degree of similarity between the charged and uncharged crimes, the number of similar incidents, and the proximity or remoteness in time are all factors in determining whether the similar crimes can be introduced to negate innocent intent. *See Willcher, supra,* 408 A.2d at 76 ("[t]o be probative of intent, however, the prior criminal conduct usually must involve an offense similar in kind and reasonably close in time to the charge at trial").

introduction of the other crimes evidence is probative of intent or identity, although those are elements of almost every crime. Third, the proponent may give the "illusion" of compliance with the rules by identifying the contested issue and by articulating an independent theory of relevance, but the alleged "independent" theory will not support the generation of a legitimate, non-propensity inference of guilt on the contested issue. Such is the case here.[10] *See* Part II, *infra.*

It must be remembered that the propensity inference is self-generating. When other crimes evidence is introduced without regard to the process by which a non-propensity inference may be generated, what remains—all that remains—is the illegitimate propensity inference.

## II.

Identity is indisputably the contested issue in this case.[11] The majority's claim is that the evidence of the Maryland robbery is admissible as proof of the identity of the Saferight robbers by use of the modus operandi theory of proof of identity. The government's claim is that not only does the modus operandi theory apply, but also, the common scheme or plan theory of proof

of identity. Both claims are faulty. Because nothing unique in the manner of the commission of both these robberies generates an inference that one and the same set of perpetrators committed both crimes and because no true plan interlocking the two robberies generates an inference that these appellants, as opposed to other persons who had no such plan, committed the charged crime, the only inference left by the introduction of the evidence of the Maryland robbery is appellants' propensity to commit supermarket robberies.

### A.

This court has repeatedly and vigorously articulated the appropriate test for admissibility under the modus operandi theory of proof of identity. Admissibility is permitted when:

> the evidence shows that the defendant has committed crimes *so nearly identical in method* that it is likely the present offense has been committed by him.

*Bridges v. United States, supra,* 381 A.2d at 1075 (citing McCORMICK ON EVIDENCE § 190 at 449 (2d ed. 1972)) (emphasis added), *cited in Artis v. United States,* 505 A.2d 52, 56 (D.C.1986); *Campbell, supra*

---

**10.** Of course, the errors in the introduction of this evidence are not mutually exclusive nor is this short list exhaustive. Indeed, one of the shortcomings of a substantive approach like the shotgun approach is its disregard for the procedural mechanisms which might be necessary to ensure compliance with the threshold requirements of admissibility. The approach may ignore that probative value versus prejudice is sometimes incapable of being ascertained in advance of the trial. *See Bussey, supra* note 1, 139 U.S.App.D.C. at 273, 432 F.2d at 1335 (court should conduct an initial inquiry to determine if defendant was perpetrator or co-perpetrator of the uncharged crime by "clear and convincing" evidence); *Graves, supra* note 2, 515 A.2d at 1141 (case-in-chief introduction of other crimes evidence on intent theory problematic because "the trial court will usually not be in a position to decide whether the probative value of that evidence outweighs the prejudice ... until the court has heard not only the rest of the government's case but also the defendant's response"); *United States v. Robinson,* 700 F.2d 205, 213 (5th Cir.1983), *cert. denied,* 465 U.S. 1008, 104 S.Ct. 1003, 79 L.Ed.2d 235 (1984) (trial court, when requested, must articulate factors which demon-

strate that the probative value of the evidence outweighs the prejudice); Super.Ct.Crim.R. 12(c) (government "may give notice to the defendant of its intention to use specified evidence at trial"). *See generally* IMWINKELRIED, *supra* note 1, §§ 9:01–9:68 (procedural limitations on evidence of defendant's uncharged acts); 2 WEINSTEIN, *supra,* ¶ 404[19] ("procedural aspects" of other crimes evidence).

**11.** The majority characterizes "identity" as an "issue of concern," rather than a "contested issue" or an "issue in genuine controversy." *Ante* at 695. Such a characterization will perhaps unfortunately further contribute to the confusion surrounding this doctrine. Every element of a crime can be characterized as an "issue of concern," in that the government must prove every element beyond a reasonable doubt. Not every element, however, can be characterized as "contested" or "in genuine controversy." The requirement that an issue be "contested" is essential: evidence directed to an uncontested issue would have marginal probative value (since, by definition, the issue in uncontroverted), while the self-generating prejudicial effect would be great.

note 2, 450 A.2d at 431; *Warren, supra,* 436 A.2d at 832.

Each of the court's several expressions of this test require "uniqueness" in the modus. Thus, a showing of the concurrence of "unusual and distinctive facts" is sufficient to sustain admissibility. *Artis, supra,* 505 A.2d at 56; *Cox v. United States,* 498 A.2d 231, 238 (D.C.1985); *Brooks v. United States,* 448 A.2d 253, 257 (D.C.1982); *Warren, supra,* 436 A.2d at 832; *Tinsley v. United States,* 368 A.2d 531, 534 (D.C.1976); *Bussey, supra* note 1, 139 U.S.App.D.C. at 271, 432 F.2d at 1333; *Drew, supra,* 118 U.S.App.D.C. at 16, 331 F.2d at 90. Or, when the crimes committed had a "signature" quality, admissibility is permitted. *Warren, supra,* 436 A.2d at 832; *Bussey, supra* note 1, 139 U.S.App. D.C. at 271, 432 F.2d at 1333. "Striking" similarity has also been used as the basis for admission. *Arnold v. United States,* 358 A.2d 335, 338 (D.C.1976) (en banc).

Mere similarity is not and never has been sufficient. Other courts and all commentators uniformly agree that uniqueness, or an expression equivalent to uniqueness, is the appropriate test. "The question for the court is whether the characteristics relied upon are sufficiently idiosyncratic to permit an inference of pattern for purposes of proof." 2 WEINSTEIN and BERGER, WEINSTEIN'S EVIDENCE ¶ 414[16] at 404—129-30 (1986). *See also* McCORMICK ON EVIDENCE § 190 at 559 (3d ed. 1984) (the evidence is admissible "to prove other crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused"); 1 C. TORCIA, WHARTON'S CRIMINAL EVIDENCE § 243 at 549-59 (13th ed. 1972) ("[w]here the crime charged was committed by novel means or in a particular manner, evidence of another crime may be admitted for the purpose of identifying the accused as the author thereof"); IMWINKELRIED, *supra* note 1, § 3:10, ch. 3 at 21 ("the prosecutor must establish: (1) both crimes were committed with the 'same' or strikingly similar methodology; and (2) the methodology is so unique that both crimes can be attributed to 'one' criminal") (footnotes omitted).

The requirement of uniqueness in the modus is, of course, derived from the underlying justification for the introduction of this other crimes evidence. In order to generate an inference that the perpetrator of the charged and uncharged crimes is one and the same, the modus must be such that only one person can be realistically earmarked as the perpetrator. Very simply:

> Proof of acts of the same generic type is insufficient to support a permissive inference that the acts were performed by the "same" person.

IMWINKELRIED, *supra* note 1, § 3:11, ch. 3 at 23 (citing *R. v. Morris,* 54 Cr.App. Rep. 69, 80 (1970)).

The majority's test for admissibility is based on a very low degree of similarity. Absent is this court's long standing requirement of uniqueness or striking similarity—a requirement that cannot be satisfied on the facts of this case.[12]

The so-called similarities between these two robberies do not distinguish them from many "which have come before this court ... and for which persons other than appellant[s] were convicted." *Bussey, supra* note 1, 139 U.S.App.D.C. at 271, 432 F.2d at 1333. The points of similarity are "so common ... as to be entirely unhelpful." *United States v. Ezzell,* 644 F.2d 1304, 1306 (9th Cir.1981). Two men entered a supermarket. One acted as a lookout. The other used a gun to demand cash from

---

**12.** A test phrased in terms of similarity has its origin in *Samuels v. United States,* 385 A.2d 16, 18 (D.C.1978) (issue was improper joinder of two robbery offenses but court reasoned no undue prejudice because "the two were so similar and so proximate in time as to tend to establish [appellant's] identity") and *Gates, supra,* 481 A.2d at 123 ("we find sufficient similarities" to permit admissibility). *Samuels* and *Gates* purport to rely on *United States v. McCray,* 140 U.S.App.D.C. 67, 433 F.2d 1173 (1970), *Warren, supra,* 436 A.2d 821 and *Calaway, supra* note 2, 408 A.2d 1220. In neither *McCray* nor *Warren* was a test based on similarity enunciated. *See McCray, supra,* 140 U.S. App.D.C. at 69, 433 F.2d at 1175 ("the conduct was 'so unusual and distinctive as to be like a signature'"); *Warren, supra,* 436 A.2d at 832 (the modus must be "nearly identical in method"). The court in *Calaway* used the language "significant similarities." *Calaway, supra* note 2, 408 A.2d at 1226.

the employee in charge of the money. Both men fled the scene on foot, running around the store to the rear.

The court's reliance on the similarities of the stores' floor plans and office booths and the distinctive location of the stores' mailbags confuses the modus operandi of Giant food store chains with the significantly less unique modus of appellants. A factor completely outside the control of appellants, such as the location of the mailbags, cannot be indicative of appellants' modus. To the extent that the other factors might indicate appellants' decision to rob Giant food stores chains, the majority itself must concede that many persons other than appellants have been responsible for supermarket robberies. *See Drew, supra,* 118 U.S.App.D.C. at 19, 331 F.2d at 93 (fact that both robberies were committed against High's Dairy stores not too significant since stores of that type "are particularly vulnerable" to robberies).

Furthermore, significant dissimilarities between the two robberies "undermine[ ] the force of the inference of identity" and militate against admissibility. *United States v. Myers,* 550 F.2d 1036, 1046 (5th Cir.1977); *see Drew, supra,* 118 U.S.App. D.C. at 19, 331 F.2d at 93 (distinction between degree of force used "takes on enhanced significance" in rejecting mutual admissibility). The trial court found as a matter of fact that the guns used in the robberies were not the same. Furthermore, in the charged crime, the lookout rounded up other store personnel thereby preventing a police call. In the Maryland robbery, the lookout neglected rounding up other store personnel which resulted in a call to the police.

The majority attempts to support its holding by concluding that "taken in their entirety," a calculus of the similar factors establishes a sufficient basis for admissibility. *Ante* at 696. While a "totality of the circumstances" type of test can properly be considered in determining admissibility under the modus theory, that test does not render inapplicable the uniqueness requirement. Uniqueness must arise from the composite of similar features. Otherwise, the inference of sameness of perpetrators is too remote.

Moreover, particular care must be used in translating the "totality of the circumstances" test to robbery contexts. Since the overall manner of committing store or bank robberies is constricted, the commission of this type of crime necessarily lends itself to an obvious pattern of execution. Factors such as the location of the crime, type of victim, and type of force used, which may vary considerably in murder or rape cases, are much less significant in store and bank robberies which by their very nature are committed against stores and banks usually by armed felons.

For that reason, the scope of admissibility of evidence of independent store and bank robberies has been very narrowly drawn by this court and other courts. *Drew, supra,* 118 U.S.App.D.C. at 18–19, 331 F.2d at 92–93 (two robberies of High's Dairy stores committed two weeks apart on summer afternoons when no customers were in the stores by an intruder who wore sunglasses, fit into such an "obvious tactical pattern" that joinder of the two offenses was prohibited on a reciprocal admissibility theory); *Bussey, supra* note 1, 139 U.S.App.D.C. at 271, 432 F.2d at 1333 (two robberies occurring within twenty minutes and three blocks of each other, in which two or three men entered a store, asked an employee a question, ordered those present to lie on the floor, took money from the cash register, and finally locked the victims in a backroom, "did not evince a particular pattern to the two robberies which would mark them as distinctly the 'handiwork' of the same men"); *United States v. Ezzell, supra,* 644 F.2d at 1306 (conduct of two robberies was not sufficiently "peculiar, unique or bizarre"); *United States v. Myers, supra,* 550 F.2d at 1046 ("an early afternoon robbery of an outlying bank situated on a highway, by revolver-armed robbers wearing gloves and stocking masks, and carrying a bag for the loot, is not such an unusual crime that it tends to prove" identity); *United States v. Webb,* 466 F.2d 1352, 1353 (9th Cir.1972) (two robberies in which the perpetrators wore masks and used similar types of pis-

tols were not "sufficiently distinctive" to justify admission for identity purposes). *Cf. United States v. Danzey*, 594 F.2d 905, 911 (2d Cir.1979) (appellant admitted "he had a modus operandi, practically a signature, to his robberies").

I cannot agree that the majority can reconcile its holding with *Drew* and *Bussey*. *See also, Evans v. United States*, 392 A.2d 1015 (D.C.1978) (two burglaries were held to be insufficiently unique although in each crime two males, one of whom was nicknamed "Papa," obtained entry to an occupied dwelling at night by means of a ruse involving a third person, and upon entry demanded money, expressed an interest in drugs and either threatened or physically assaulted the occupants). The cases cited by the majority to support its broad interpretation of the modus operandi theory turn on entirely different factual contexts than those present here. *Gates, supra* (robberies turned to sexual assaults against the same type of victims within a few hundred yards of each other on the same path along Rock Creek Parkway during evening rush hour by armed perpetrator); *Warren, supra* (gang abductions and rapes perpetrated with deadly weapons against same type of victims, all of whom were waiting for public transportation between sunset and midnight, by assailants driving the same small green sportscar). Finally, the uniqueness of the robberies in *Samuels, supra* note 12, 385 A.2d 16, presents a stark contrast to the robberies here. There, the same day robberies of two taxi drivers by two black women asking to be taken to the same address and robbing the drivers in the same manner generated the strong inference that the same two women were involved in both robberies and thus joinder was permissible on the reciprocal admissibility theory.

Indeed, it is interesting that the majority notes that on the very day of the Saferight robbery at issue here, a Safeway store was robbed by two armed men different from appellants. *Ante* at 694 n. 5.

### B.

The government's reliance on the common scheme or plan "exception" is perhaps even more troubling than the majority's reliance on the modus operandi theory. *See generally Ali v. United States, supra* note 1 (discussion of admissibility under the common scheme or plan exception).[13] The government in effect argues that appellants' commission of the Maryland robbery and their commission of the Saferight robbery establish a common scheme or plan. The common scheme or plan, rather than the particular elements of the charged robbery, has become the ultimate inference. *See Ali, supra* note 1, 520 A.2d at 311. When the ultimate inference generated by other crimes evidence is not appellants' greater likelihood of guilt on a contested issue in the charged crime, the other crimes evidence is offered for nothing other than appellants' possible propensity to commit robberies.

Admissibility on the basis of the so-called "common scheme or plan" theory of proof of identity is proper if a true scheme or plan is proved which raises the probability of appellants' participation in the robbery by setting them apart from others who had no such plan. *Id.* at 312; *see Hackney v. United States*, 389 A.2d 1336 (D.C.1978), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 95 (1979) (evidence of a cover-up plan inferentially proved appellant's identity). Here, there is no proof of "a true plan in the [appellants'] mind[s] which includes the charged and uncharged crimes as stages in the plan's execution." *Ali, supra* note 1, 520 A.2d at 312. The Maryland robbery was not shown to be dependent upon nor interlocked with the Saferight

---

**13.** Some courts and commentators invoke the "common scheme or plan" exception when describing the "res gestae" of the charged crime. *See* 2 WEINSTEIN, *supra,* ¶ 404[16]. However, in this jurisdiction, what we have defined as the "immediate surrounding circumstances" justification for the introduction of this evidence (*i.e.,* the "res gestae" theory in other jurisdictions) is distinct from the common scheme or plan exception and indeed falls outside the other crimes evidence doctrine. *Toliver, supra* note 1, 468 A.2d at 960; *see Green, supra* note 1, 440 A.2d 1005 (D.C.1982). *Ali* addressed the common scheme or plan "exception," not the "immediate surrounding circumstances" "exception."

robbery. Indeed, the only possible inference from the evidence is that these two somewhat similar robberies were the result of two separate decisions to rob.

In effect, the government's approach comes perilously close to a "plan-to-commit-a-series-of-similar-crimes theory." *See* IM-WINKELRIED, *supra* note 1, § 3:23, ch. at 61. A series of similar crimes, without more, is insufficient to establish a plan. *See Ali,. supra* note 1, 520 A.2d at 311–12. At its root, the only logical inference generated by the introduction of other crimes evidence under this "theory" is an accused's possible predisposition to commit a certain type of crime rather than another, that is, to be a bank robber rather than a burglar.

### III.

Finally, I suggest that the alleged "prophylactic" steps taken by the trial court to minimize the risk of the jury's improper use of this evidence were extremely prejudicial and counter-productive. *Five* times the jury was reminded of the "limited" use of the evidence. Repetition of this type only serves to magnify the prejudicial effect of this evidence and entrench it in the jurors' minds. Since the government, the trial court and now the majority have not agreed on the "limited" purpose of this evidence, it indulges wild speculation to suggest that the jury could have done so.

It is my belief that, regardless of instructions, if other crimes evidence is admitted, the jury will inescapably use the evidence for propensity purposes. *See* Lawson, *Credibility and Character: A Different Look at an Interminable Problem,* 50 No-TRE DAME L.REV. 776 (1975) (some empirical research results indicate that "when forming a unitary impression of a defendant's personality, jurors will be greatly influenced by evidence of prior criminal behavior"). Such a result does not trouble me when, through careful analysis, the evidence is properly admitted to generate an inference other than propensity and that inference outweighs the propensity inference. In those circumstances, its probative value outweighs its prejudice and jury ac-

cess is proper. However, I am troubled by a case such as this where the only inference generated by the other crimes evidence is appellants' possible propensity to commit a certain type of crime and that is the only inference the jury can and will make.

Since I cannot consider the improper introduction of such highly prejudicial evidence harmless error, I would reverse.

Therefore, I respectfully dissent.